Kenneth R. CAMPBELL, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

and

Joseph J. Metten, Appellant

v.

Commonwealth of Kentucky, Appellee.

Nos. 2007–SC–000382–MR, 2007–SC–000383–MR.

Supreme Court of Kentucky.

Aug. 21, 2008.

---

Karen Snuff Maurer, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant Kenneth R. Campbell.

Euva D. May, Assistant Public Advocate, Appellate Division, Frankfort, KY, Counsel for Appellant Joseph J. Metten.

Jack Conway, Attorney General of Kentucky, Heather M. Fryman, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

## MEMORANDUM OPINION OF THE COURT

Kenneth R. Campbell and Joseph J. Metten appeal as a matter of right[1] from a circuit court judgment. Campbell, Metten, and two other co-defendants were tried jointly. Because their cases involve common issues and stem from the same investigation, we elect to issue a joint opinion resolving both of their cases. Campbell was convicted of tampering with physical evidence, first-degree wanton endangerment, methamphetamine manufacture with firearm enhancement, marijuana possession with firearm enhancement, and drug paraphernalia possession with firearm enhancement and was sentenced to fifty years' imprisonment. Metten was convicted of manufacturing methamphetamine, first-degree wanton endangerment, marijuana possession, and possession of drug paraphernalia and was sentenced to twenty-five years' imprisonment.

Both appellants contend that their convictions and sentences must be reversed because (1) the trial court erred by failing to select a jury at random, (2) the trial court erred by failing to excuse a juror who knew a defense witness, and (3) the Commonwealth created error by offering all four co-defendants a package plea deal that required all four to plead guilty in order to make the deal. Campbell contends separately that the trial court erroneously denied his motion for a directed verdict on the firearm enhancement of his drug offenses. Because we find no reversible error, we affirm.

### I. *FACTS.*

This case arose from an investigation into suspicious purchases of pseudoephedrine (Sudafed) at a store in a neighboring county. Metten had made one of the purchases, and he had an outstanding bench warrant for traffic offenses in another county. His mother's boyfriend, Campbell, was also listed on the store's Sudafed log. To investigate the suspicious purchases, law enforcement officers arrived at Campbell's residence to conduct a "knock and talk." Metten answered the front door. Metten denied being Joseph Metten, and he denied knowing if Joseph Metten was at the residence.

While the officers talked to Metten, a child appeared at the door. Responding to the officer's question, the child told them that Campbell was in the back. The child opened the door. The officers could then see Campbell, Thomas Hall, and David Allen inside the house; and they could also see Metten fleeing out the back door.

---

1. Ky. Const. § 110(2)(b).

Metten was later taken into custody at another location. The officers also detected the smell of ether and observed items that led them to believe that methamphetamine was being made there. They also found marijuana in the residence and noted the presence of five children and Metten's mother, who was also Campbell's girlfriend.[2]

Metten, Campbell, Hall, and Allen were all indicted for manufacturing methamphetamine, wanton endangerment, and other charges. Before trial, the Commonwealth offered to recommend sentences of ten years' imprisonment for each defendant if all four defendants would plead guilty—a package plea deal. Metten and Campbell expressed interest in this plea bargain, but Allen and Hall flatly refused the deal. The Commonwealth ultimately refused to extend the plea offer to Metten and Campbell individually.

The four co-defendants received a joint jury trial. The trial court had trouble seating a jury because many potential jurors were excused for cause. Even after calling in four potential jurors who had initially been excused, the trial court still did not have enough potential jurors to try the case.[3] The trial court then noticed a man who had been sitting in the courtroom all day. Upon questioning the man, the trial court learned that the man had been summonsed for jury duty; but he did not hear the clerk call his name during roll call. The man told the trial court he had

remained in the courtroom all day, had taken the oath to answer truthfully the questions posed to the venire, and had heard all of the questions the court asked. The court allowed counsel for each co-defendant[4] to question the man. This prospective juror's responses revealed no bias or other reason why he should not serve, so the trial court put the man on the jury panel over Metten's objection. The parties each exercised their peremptory strikes, leaving twelve jurors and one alternate to hear the case. Ultimately, one juror was excused for pending litigation against one of the defendants. So the man who had not heard his name called at roll call sat as a juror in the trial of this case.

During his case in chief, Hall called his wife, Alicia Hall, to testify. This prompted the trial judge to announce an immediate recess in the trial proceedings and to hail counsel into chambers. In chambers, the trial judge explained that upon seeing Alicia Hall in person, he recognized her as the daughter of Barry Lucas, whom he characterized as a "notorious criminal in the community." The trial court expressed concern that jurors might recognize Alicia Hall as a member of the Lucas family and stated that the jurors should have been questioned about the effect of the Lucas family's reputation in voir dire.

After the trial court administered the oath to Alicia Hall as a witness, a juror asked to speak with the judge in cham-

2. According to Metten's brief, law enforcement searched the residence after obtaining consent from Campbell and his girlfriend. Neither Metten nor Campbell contests the constitutional validity of the "knock and talk" or the search in this appeal.

3. Thirty-seven jurors were eventually placed on the jury pool—apparently to allow the Commonwealth eight peremptory strikes, the defendants eight joint peremptory strikes (Kentucky Rules of Criminal Procedure (RCr)

9.40(1)), each of the four defendants one additional peremptory strike since an additional alternate juror was also called (RCr 9.40(2)), and each of the four defendants a second additional strike since more than one defendant was being tried (RCr 9.40(3)), for a total of twenty-four peremptory strikes.

4. Each co-defendant had his own separate attorney; none was jointly represented by the same attorney.

bers. The juror explained that he had known Alicia Hall when she was a child and "a Lucas." He knew her father and was aware of the family's problems. After sending the juror back to the courtroom, the judge noted that Barry Lucas had "been indicted for everything in the world at one time or another" and expressed his concern about the effect of Alicia Hall's testifying because of Barry Lucas's notoriously bad reputation in the community and a series of indictments and convictions, even stating a fear that "at this point in time, it ain't going to be a fair trial." He worried that a juror "could be somebody that Barry has tried to kill for fooling around with her, or that Barry has tried to shoot or sell drugs to." He specifically noted an incident a few years before the instant trial where Barry Lucas had been indicted for trying to shoot someone, and the judge asked defendant Hall if he was the one Lucas had tried to shoot:

Trial Court: Not too long ago, I lose track of time, he was under indictment for having attempted to shoot someone for fooling around with her. And there was, how long have you all been married?

Defendant Hall: Four years.

Trial Court: Did he try to shoot you? Are you the one he tried to shoot?

Defendant Hall: No.

Trial Court: He ran somebody off the road up here at Hardin and tried to shoot them for screwing around with her.

Defendant Hall: No, that was for screwing around with his wife.

Trial Court: Well, same thing, same problem. I will do whatever you all want to do. I don't care. A jury may well say she is a Lucas. They are every damn one guilty. If she's a Lucas, they are guilty. That may well be. Or they may say, I ain't going to

believe nothing they have to say from now on out. But that is the reputation we are putting on the line here.

Following this exchange, Metten moved for a mistrial. But Allen and Hall wished to proceed.

The trial court then brought the juror separately back into chambers for further questioning. The juror then explained in more detail that he had dated Alicia's aunt fourteen or fifteen years before this trial, and he stated that he and the aunt "did not go around [the Lucas] side of the family" much because of Barry Lucas. He stated he had feelings about Barry Lucas, but these feelings did not carry over to Alicia Hall and that he could separate her from his father. The trial court admonished the juror not to inform the other jurors that Alicia Hall was the daughter of Barry Lucas and sent him to rejoin the jury.

After denying Metten's motion for a mistrial, the trial court then allowed Alicia Hall to testify. She testified that before they were apprehended at Campbell's residence, Hall and Allen were sent to Campbell's residence by her for the purpose of delivering a sewing machine to Campbell's girlfriend, who was at that residence. She also admitted to having purchased Sudafed herself, stating that she was pregnant at the time and took it for congestion as her doctor recommended.

Hall and Allen argued they were only at the Campbell residence to deliver the sewing machine and had no awareness of the meth lab there. Metten also denied being aware of the meth lab and stated he was only at the Campbell residence to spend time with family but denied living there himself. He admitted lying to the officer about his identity because he knew of an outstanding bench warrant for his arrest and did not want to go to jail. He also admitted buying Sudafed on one occasion

but said he did so for Campbell and denied being involved with Campbell's methamphetamine manufacturing. Campbell admitted to manufacturing methamphetamine (although he denied doing so on the day police arrived at the house to investigate) but denied his guilt of other charges against him and contested the firearm enhancement

The jury acquitted Allen and Hall on all charges. It also acquitted Metten of one charge (tampering with physical evidence) but convicted him on other charges, including manufacturing methamphetamine and first-degree wanton endangerment.[5] The jury recommended twenty years' imprisonment for the manufacturing methamphetamine charge and five years' imprisonment on the wanton endangerment charge, to be served consecutively for Metten's sentence. The jury convicted Campbell of first-degree wanton endangerment, tampering with physical evidence, firearm-enhanced methamphetamine manufacture, firearm-enhanced marijuana possession, and firearm-enhanced drug paraphernalia possession. For Campbell's sentence, it recommended fifty years' imprisonment for firearm-enhanced methamphetamine manufacture and five years' imprisonment for each of the other offenses, to be served concurrently for a total of fifty years' imprisonment. The trial court entered judgment against Metten and Campbell in accordance with the jury's verdicts and sentencing recommendations. Metten and Campbell then separately filed their appeals.

## II. ANALYSIS.

### A. No Error Occurred in Placing Potential Juror Who Did Not Answer During Roll Call on Panel.

■ The appellants contend that they were deprived of the right to a randomly selected jury when the trial court placed on the jury panel the potential juror who had not heard his name called during roll call. We shall refer to this juror as "Juror S" in order to protect the juror's privacy. As they contend, because of Juror S's failure to answer in roll call, Juror S's number was not placed in the box from which the clerk randomly pulled potential jurors' numbers to come forward to participate in voir dire. Appellants argue that "[b]y including [Juror S] as the final juror 'drawn' on the voir dire panel, the court manipulated the list of names who will eventually compose the empanelled jury," increasing the likelihood that Juror S would serve on the jury or be eliminated by a peremptory strike by the defense.

We find no indication that the trial court tried to manipulate the jury list. Rather, it appears that the trial court's actions substantially complied with RCr 9.30, which provides that:

(1) (a) In a jury trial in circuit court the clerk, in open court, shall draw from the jury box sufficient names of the persons selected and summoned for jury service to compose a jury as required by law. If one or more of them is challenged, the clerk shall draw from the box as many more as are necessary to complete the jury.

   (b) If there is an irregularity in drawing from the jury box, the names of the jurors so drawn shall be returned to the box.

   (c) When it appears that the names in the jury box are about to become

---

5. The jury also convicted Metten of possession of marijuana and possession of drug paraphernalia and recommended a sentence of twelve months' imprisonment for each of these offenses. These misdemeanor sentences were each ordered to run concurrently with the felonies. KRS 532.110(1)(a).

exhausted, the judge may obtain additional jurors by drawing from the drum, or, with the consent of the parties, by ordering the sheriff or a bailiff appointed by the court to summon any number of qualified persons.

   (2) The jury-selection process shall be conducted in accordance with Part Two (2) of the Administrative Procedures of the Court of Justice.

Jury selection began with the clerk drawing out potential juror names from the box for questioning and then drawing out additional juror names as potential jurors were excused for cause in accordance with RCr 9.30(1)(a). The entire venire was about to be depleted. This would have allowed the trial court to draw more names from the drum or order law enforcement to summons other qualified persons. RCr 9.30(1)(c). Instead, the trial court made efforts to obtain a sufficient jury panel with potential jurors who had already been summonsed for jury duty. According to Appellants, the trial court re-called potential jurors whose absences had been previously excused,[6] but further questioning resulted in one being eliminated for cause.[7] Juror S's presence was then discovered, and the trial court called on Juror S to see if he might qualify as a potential juror.

   We note preservation of this issue is questionable at best. Metten joined Allen's objection, but Allen stated that the objection might be cured with further inquiries into Juror S's presence and attention during voir dire questioning. Metten failed to renew his objection *after* the trial court indicated Juror S would be seated on the panel following questioning. Campbell never even explicitly joined Allen's objection and stated there would be no objection on his part so long as Juror S was subject to voir dire questions.

   Although the trial court's handling of this matter may have deviated from the procedure laid out in RCr 9.30, we find no substantial deviation from the required random selection process. Juror S was a potential juror who had already been summonsed for jury service that day, and his name was initially not put in the box as a result of innocent human error and not as a result of any intentional act to reserve him for last.

   This case differs from *Robertson v. Commonwealth*,[8] where we found a substantial deviation meriting reversal, despite apparent lack of prejudice, because the trial court had the jurors called in order of their juror number for questioning, with numbers 1 through 12 called first, with jurors excused for cause replaced by the next number in order. The deviation in *Robertson* was substantial because it created a problem whereby the parties knew who each replacement could be and could manipulate their strikes to obtain a particular person on the panel.[9]

   In contrast to *Robertson*, no one in the instant case knew in advance that Juror S would be called last. And we fail to see how the trial court's method of dealing with the potential juror shortage in this manner prejudiced Metten or Campbell, since no one knew in advance that Juror S would be questioned last, since Juror S

---

6. The Commonwealth claims these four jurors had arrived late, resulting in their names not initially being placed in the jury box. Whether the four jurors had excused absences or arrived late is not germane to the issues of this case.

7. Appellants do not claim error in the trial court re-calling these potential jurors whose absences had previously been excused.

8. 597 S.W.2d 864 (Ky.1980).

9. *Id.* at 865.

was questioned in the same manner as other potential jurors, and since nothing prevented any party from exercising a peremptory strike on Juror S if they did not wish him to serve. Moreover, all parties, including Metten and Campbell, were permitted to examine Juror S in as much depth as they deemed proper; yet, those examinations failed to show that Juror S was biased for or against any defendant or the Commonwealth.

■ Because of Metten's questionable preservation and Campbell's lack of preservation of this issue,[10] the lack of substantial deviation from the random selection process, and the lack of prejudice, we find no reason to reverse Appellants' convictions on this basis.[11]

B. *No Reversible Error in Denying Mistrial When Juror Recognized Alicia Hall.*

■ Next, Appellants contend that the trial court should have granted a mistrial because one juror knew Alicia Hall (formerly Alicia Lucas).[12] They argue this juror should have been excused for cause, which would have left an insufficient number of jurors to decide the case, thus, necessitating a mistrial. We review the trial court's denial of this mistrial motion under an abuse of discretion standard.[13]

This juror, whom we will refer to as Juror M to protect his privacy, came forward to disclose to the trial court that upon seeing Alicia Hall on the witness stand, he recognized her because he had known her when she was a child, then known as Alicia Lucas. Juror M stated that he had dated Alicia's aunt about fourteen or fifteen years before. We first note that this is not the type of "close familial relationship" that, by itself, merits dismissing a juror for cause. For example, although a juror should be dismissed for cause if he/she has a close family relationship with a party, we have stated that a more attenuated family relationship such as being a distant cousin does not mean a

10. As our predecessor court stated in *Price v. Commonwealth*, 474 S.W.2d 348, 350 (Ky. 1971): "where two or more defendants are being tried together, it is incumbent upon each party to timely make the court aware of his objection to any of the proceedings. This may be done on behalf of one of the parties or jointly on behalf of others, but the court must be informed of the position taken by a party or he cannot later complain." As Campbell never joined any objection to Juror S being placed on the jury panel at all, but simply stated through counsel that Juror S should be subjected to voir dire questioning like other jurors, he cannot complain now that Juror S was placed on the jury panel after being subjected to voir dire questioning.

11. *See Hodge v. Commonwealth,* 17 S.W.3d 824, 840 (Ky.2000) (noting lack of "any premeditation or manipulation of the jury selection process" and finding any error harmless where two alternate jurors misunderstood clerk's reading of alternate juror number to be excused following clerk's random draw of alternate jurors to be excused, resulting in wrong juror leaving and wrong juror staying on to decide case).

12. We note that Campbell claims on page 20 of his brief that his counsel moved for a mistrial. However, after reviewing the cites to the record provided by the parties concerning this matter, we have not found any instance in which Campbell explicitly moved for a mistrial on his own behalf or joined Metten's motion for a mistrial. Even if Campbell had moved for a mistrial, the result would not be different as we have concluded the trial court did not abuse its discretion by refusing to declare a mistrial.

13. *Woodard v. Commonwealth,* 147 S.W.3d 63, 68 (Ky.2004). We have also stated that "[a] trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for abuse of discretion." *Lester v. Commonwealth,* 132 S.W.3d 857, 863 (Ky.2004).

juror must be dismissed for cause.[14] We have even stated that an "ex-brother-in-law" of a party—someone who presumably might have had a close relationship with a party at one time but whose relation by marriage had ended sometime in the past—should not necessarily be dismissed for cause.[15] And we found no error in a juror not being dismissed for cause where she reported that her daughter had once been friends with one of multiple defendants, but the daughter and the co-defendant had not had contact for approximately three years.[16] In this case, the juror did not claim to have had close contact with Alicia Hall (then Lucas) in the past. He simply recognized her because he had dated her aunt. Furthermore, he stated he had not seen Alicia for years before trial. Thus, there was no reason to declare a mistrial due to Juror M's mere acquaintance with Alicia several years before trial.

Even Juror M's awareness of Alicia's father's troubles and bad reputation, which led him to avoid "that side of the family" several years before trial, would not create a "manifest necessity" for a mistrial[17] since Juror M stated that Barry Lucas's reputation had nothing to do with Alicia herself, his opinion of any defendant would not change as a result of Alicia being married to one of the defendants, and his former acquaintance with Alicia and knowledge of her family reputation would not affect his consideration of the case.[18]

This case is distinguishable from *Randolph v. Commonwealth*,[19] in which a juror's employment relationship with a party (she served as secretary to the Commonwealth's attorney) meant she should be dismissed for cause.[20] There was no employment relationship or other close relationship at issue here. Nor is this case similar to *Marsch v. Commonwealth*,[21] wherein we held that jurors who admitted to having already developed opinions re-

---

**14.** *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky.1985) (in reviewing alleged errors in failing to excuse certain jurors for cause, including a juror whom the Commonwealth's attorney had always regarded as his uncle, stating "[w]e have no fault to find in regard to the ex-brother-in-law or even the distant cousin and we trust that, under this statement of principle, no uncles will survive the challenge for cause on retrial.")

**15.** *Id.*

**16.** *Ratliff v. Commonwealth*, 194 S.W.3d 258, 266 (Ky.2006).

**17.** *See Woodard*, 147 S.W.3d at 68 ("a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings and there is a manifest necessity for such an action.") (internal quotation marks omitted).

**18.** *See Turner v. Commonwealth*, 153 S.W.3d 823, 833 (Ky.2005) (finding no abuse of discretion in trial court not excusing for cause juror with personal relationship to two witnesses who also remembered reading some-

thing about case in the newspaper since juror made affirmative statement that she had developed no prejudices and could render a fair and impartial verdict).

> We also note that the trial court's expressed concerns about the Lucas family's reputation possibly tainting the whole trial (which should have been explored in voir dire, in his opinion) were simply personal concerns that were not reflected by any juror's statements nor expressed to the jury at any point. Thus, having had the benefit of being able to examine the entire record, we must disagree with the trial court's spontaneous, unfortunate exclamation that the revelation regarding Alicia Hall being Barry Lucas's daughter meant that the defendants could not receive a fair trial.

**19.** 716 S.W.2d 253 (Ky.1986) (*overruling on other grounds recognized in Commonwealth v. Wolford*, 4 S.W.3d 534 (Ky.1999)).

**20.** *Randolph*, 716 S.W.2d at 255.

**21.** 743 S.W.2d 830 (Ky.1987).

garding the case could not be rehabilitated by leading questions asking if they could disregard their prior opinions.[22] Juror M had not previously developed opinions of this case or even of witness Alicia Hall. These two cases, cited by Appellants, do not establish an abuse of discretion by refusing to dismiss Juror M for cause or by denying a mistrial. So we find no abuse of discretion in the trial court denying a mistrial since it was not necessary to dismiss Juror M for cause.

It is significant that Alicia's testimony directly concerned only Allen and Hall, both of whom the jury acquitted. Alicia said nothing about Metten. So, logically, there is no reason why her alleged "bad family reputation" would have made the jury more likely to infer from her testimony that Metten must have been involved in making methamphetamine. Given the lack of any association between Alicia and Metten, he could not have suffered any prejudice due to "guilt by association" with her. In sum, we find no reason to reverse Metten's conviction on this ground.

Similarly, Alicia's testimony did not directly implicate Campbell, nor did she claim such a close relationship with Campbell that the jury might have assumed "guilt by association" due to her family's reputation. She stated that she knew him from work, that she or her husband had given him a ride to work on a couple of occasions, that he seemed like a nice person, and that she had sent her sewing machine to Campbell's girlfriend after a yard sale. Campbell did not elect to cross-examine her. Given the innocuous nature of Alicia's testimony and her mere passing acquaintance with Campbell and Juror M, we find no reason to reverse Campbell's conviction especially in light of his failure to cite to the record to show where he moved for a mistrial on this ground.[23]

C. *No Error in Going to Trial When Co–Defendants Rejected "Package Plea Deal."*

■ Each Appellant contends that we should reverse his convictions and remand the case to the trial court with instructions to sentence him to ten years' imprisonment on amended charges in accordance with a "package plea deal," which co-defendants Hall and Allen rejected, but which Metten and Campbell now say they would have accepted. While conceding that they had no constitutional right to a plea bargain,[24] they contend that the "package plea deal" conditioned upon all defendants agreeing to the plea bargain was arbitrary and left the decision of whether they went to trial in the hands of other defendants.[25]

---

**22.** *Id.* at 833–34. *See also Montgomery v. Commonwealth*, 819 S.W.2d 713, 716–18 (Ky. 1991) (discussing how jurors who had already admitted to forming opinions in case could not be rehabilitated by "magic question" about putting such opinions aside).

**23.** Since Campbell apparently failed to join the mistrial motion, he has not preserved this issue. *Price*, 474 S.W.2d at 350. Thus, we review this issue under the standard of RCr 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.") In our view, any error did not affect Campbell's substantial rights and no manifest injustice resulted. Thus, he is not entitled to relief.

**24.** *Weatherford v. Bursey*, 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

**25.** We cannot agree with Appellants that this "package plea deal" left the decision to go to trial in other defendants' hands as Metten was free to enter into an open plea of guilty.

■ While we recognize that some federal courts have expressed concern that such "package plea deals" may be coercive where they have led to a defendant pleading guilty and have led to even more searching analysis of whether a guilty plea is truly voluntary,[26] we are unaware of any authority that would support reversing a conviction entered against a defendant who did not plead guilty because of a co-defendant's refusing a package plea deal. As Appellants admit, "a plea bargain is merely a contract; only the guilty plea and subsequent deprivation of liberty implicate the Constitution." [27]

Essentially, the Commonwealth was not required to offer any of the defendants a plea bargain.[28] So the fact that Metten and Campbell were not able to enter into a plea bargain with the Commonwealth because of their co-defendants' refusal of this "all for one deal" does not entitle them to relief.

D. *Trial Court Properly Denied Campbell's Motion for Directed Verdict on Firearm Enhancement.*

■ The Commonwealth sought to have Campbell's sentences for drug offenses enhanced under KRS 218A.992 (possession of firearm at time of and in furtherance of drug offenses). Campbell moved for a directed verdict on the firearm enhancement, based on lack of proof of the firearm's operability, and argues that the trial

court committed reversible error in denying this motion. The jury found Campbell guilty of all three drug offenses (methamphetamine manufacture, marijuana possession, and drug paraphernalia possession) and further found beyond a reasonable doubt that Campbell had possessed a firearm in furtherance of all three drug offenses. The jury recommended the maximum enhanced sentences available for these three offenses (fifty years' imprisonment on the enhanced methamphetamine manufacture, and five years' imprisonment each on the enhanced possession of marijuana and enhanced possession of drug paraphernalia convictions).

Police had found a rusty or corroded sawed-off shotgun behind the headboard of a bed in Campbell's home when searching the home for evidence of suspected methamphetamine manufacture. The gun was not subjected to any ballistics testing before trial, and neither party presented proof as to whether the gun was actually capable of firing. The Commonwealth had announced its intention at an in-chambers conference during trial to offer a police officer's testimony that the gun would actually fire bullets, but the trial court sustained Campbell's objection that this evidence should be excluded due to lack of prior notice.[29] So this case squarely presents the question of whether the prosecution has the burden of proving the opera-

**26.** *See, e.g., United States. v. Usher,* 703 F.2d 956 (6th Cir.1983); *United States v. Gonzalez–Vasquez,* 219 F.3d 37, 43 (1st Cir.2000).

**27.** *Mabry v. Johnson,* 467 U.S. 504, 507–08, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).

**28.** *Commonwealth v. Corey,* 826 S.W.2d 319, 321 (Ky.1992) (in holding that trial court lacked authority to initiate and accept conditional guilty plea over Commonwealth's objection, stating "that whether to engage in plea bargaining is a matter reserved to the sound discretion of the prosecuting authority"

and also noting both parties' right to jury trial under RCr 9.26 and defendant's right to enter open plea of guilty under RCr 8.08.)

**29.** The trial court stated it would exclude the Commonwealth's evidence of the weapon's operability, based on lack of prior notice, but stated that the Commonwealth could offer rebuttal evidence if the defense presented evidence that the weapon was inoperable. Since the defense offered no evidence of its inoperability, no proof was ever presented either way on whether it was or was not operable.

bility of a firearm in order to enhance sentences for drug offenses under KRS 218A.992 or whether the inoperability of the firearm is an affirmative defense that the defense has the burden of proving.

The firearm enhancement is set forth in KRS 218A.992, which states, in pertinent part, that:

1) Other provisions of law notwithstanding, any person who is convicted of any violation of this chapter who, at the time of the commission of the offense and in furtherance of the offense, was in possession of a firearm, shall:

   (a) Be penalized one (1) class more severely than provided in the penalty provision pertaining to that offense if it is a felony; or

   (b) Be penalized as a Class D felon if the offense would otherwise be a misdemeanor.

A firearm is defined in KRS 237.060(2) as "any weapon which will expel a projectile by the action of an explosive." By the plain language of this definition, a gun must be able to shoot bullets or other projectiles to qualify as a "firearm." [30] This is in contrast to federal firearm enhancement for drug offenses where the relevant statutory definition of firearm explicitly includes weapons *designed* to eject projectiles by explosive action or weapons that *can be converted* to eject projectiles by explosive action, as well as those that actually will eject projectiles by explosive action.[31]

In *Arnold v. Commonwealth,*[32] the Court of Appeals recently held that in carrying concealed deadly weapons cases, the inoperability of the weapon is an affirmative defense that the defense had the burden of proving. This holding conforms to our precedent.[33] And we find no reason to treat the alleged inoperability of a weapon differently in the context of firearm enhancement of drug convictions.

Although *firearm* definitions for carrying concealed deadly weapons and for firearm enhancement purposes are provided in different sections of the Kentucky Revised Statutes, the language in these sections is identical. Both KRS 527.010(4) (applicable to carrying concealed deadly weapons cases under KRS 527.020) and KRS 237.060(2) (applicable to firearm enhancement of drug offenses under KRS 218A.992) define a *firearm* as "any weapon which will expel a projectile by the action of an explosive." But this definition is not an element of either offense. Rather, the basic elements of the offense of carrying a concealed deadly weapon are set forth, subject to certain specified exceptions, in KRS 527.020(1):

> "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

---

**30.** Although the gun must be able to shoot projectiles, we find no indication in the statutory definition that the weapon must be loaded to qualify as a *firearm*. Thus, the fact that the sawed-off shotgun was unloaded is of little consequence. *See Commonwealth v. Harris,* 344 S.W.2d 820, 821 (Ky.1961) (pre-Penal Code case finding that under former statute criminalizing the carrying of concealed deadly weapons, it was not necessary to show that a firearm was loaded.).

**31.** *See* 18 U.S.C. § 921(3):

**32.** 109 S.W.3d 161, 163 (Ky.App.2003).

**33.** *See Mosely v. Commonwealth,* 374 S.W.2d 492, 493 (Ky.1964).

A person is guilty of carrying a concealed weapon when he or she carries concealed a firearm or other deadly weapon on or about his or her person.[34]

Required elements for firearm enhancement of drug offenses are found in KRS 218A.992(1):

Other provisions of law notwithstanding, any person who is convicted of any violation of this chapter who, at the time of the commission of the offense and in furtherance of the offense, was in possession of a firearm[.]

Because the operability of the firearm is not an element of the firearm enhancement, the inoperability of a firearm is an affirmative defense for which the defense has the burden of proof. So the total lack of proof as to operability does not entitle Campbell to a directed verdict on the firearm enhancement.

■ Furthermore, the proof was sufficient to create a jury issue as to the elements of the firearm enhancement: possession of a firearm at the time the drug offenses were committed and possession of a firearm in furtherance of the drug offenses. Whether or not the gun was covered by bedding, it was found in Campbell's home and, thus, in his constructive possession.[35] Furthermore, given its proximity to the marijuana, drug paraphernalia, and methamphetamine manufacturing equipment found, the jury could reasonably infer that it was used in furtherance of the drug offenses. Thus, the trial court properly denied the directed verdict motion pursuant to the directed verdict standard in *Commonwealth v. Benham:* [36]

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreason-

---

**34.** *Deadly weapon* is defined as including "[a]ny weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged". KRS 500.080(4)(b).

**35.** *See Pate v. Commonwealth,* 243 S.W.3d 327, 332 (Ky.2007) ("Mrs. Pate testified that Appellant actually lived in the apartment and his clothing and legal documents (*e.g.,* social security card) were located in the apartment. When he was arrested, Appellant told police that the equipment they were seizing was his and that they were seizing it illegally. In light of this evidence, we reject Appellant's argument that he did not possess, constructively or otherwise, the equipment found in the apartment.") *See also Houston v. Commonwealth,* 975 S.W.2d 925, 927 (Ky.1998) (holding that constructive possession of fire-

arm sufficient for firearm enhancement of drug offenses and that constructive possession established where loaded guns found in various places in other rooms of apartment where appellant caught running from one room to another); *Commonwealth v. Montaque,* 23 S.W.3d 629, 632–33 (Ky.2000) (while limiting *Houston's* holding to cases where defendant has "immediate control" over firearm in constructive possession during commission of a crime, stating that facts in *Houston* still sufficient to invoke firearm enhancement). Likewise, in this case, whether buried under bedding or not, there is at least a jury question as to whether the firearm found behind the headboard of the bed in Campbell's house was in his immediate control.

**36.** 816 S.W.2d 186 (Ky.1991).

able for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[37]

We also note that the jury was properly instructed that it must find the elements of the firearm enhancement provision beyond a reasonable doubt. The jury instructions explicitly asked whether the jury found Campbell guilty of each drug offense and, in regard to each offense, whether the jury "believe[d] from the evidence beyond a reasonable doubt that the Defendant was in possession of a firearm when he committed the offense and in furtherance of the offense."[38] This "in furtherance" language properly tracks the statute and, certainly, is more than adequate to fulfill the requirement that a nexus between the firearm possession and the drug offense be shown.[39] Furthermore, the jury was also instructed on the definition of a firearm with the exact language of KRS 237.060(2). So we find no fault with the jury instructions as to the firearm enhancement.

Because the jury was properly instructed on the firearm enhancement issue and the evidence was sufficient to withstand the directed verdict motion, we find no reversible error in the trial court's handling of this matter. So we affirm the enhancement of Campbell's drug offenses for possession of a firearm at the time of and in furtherance of the commission of the offenses.

### III. CONCLUSION.

For the foregoing reasons, the trial court's judgment is affirmed as to both Campbell and Metten.

All sitting, except VENTERS, J. All concur.

---

**37.** *Id.* at 187.

**38.** Thus, this instruction comports with the requirements of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

**39.** *See Johnson v. Commonwealth*, 105 S.W.3d 430, 435 (Ky.2003) (where firearm enhancement sought under KRS 218A.992, holding that "[a] proper instruction would have required the jury to find beyond a reasonable doubt the existence of some nexus between Appellant's possession of the pistol and each of the individual drug and paraphernalia possession charges; *i.e.*, that Appellant possessed the firearm 'in furtherance of' the underlying offenses.").