Kenneth Wayne PARKER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2006–SC–000102–MR.

Supreme Court of Kentucky.

May 21, 2009.

Rehearing Denied Aug. 27, 2009.

ous issues. We affirm, in part, and reverse, in part.

## II. FACTUAL AND PROCEDURAL HISTORY.

The facts underlying Parker's conviction are long, sordid, and difficult to recite chronologically. The indictment against Parker is twenty-eight pages long. So we will outline here only the most basic facts underlying Parker's convictions and present more detailed facts where necessary in our analysis of Parker's individual issues.

### A. The Levolia Baker Shooting.

In 1998, Parker and fellow gang members or acquaintances Dominique Coffey and JaJuan Stephenson went looking for Parker's missing sister, who allegedly had been spending time with Levolia "Squirrel" Baker. When Parker and his companions saw Baker, they shot him. Stephenson was charged with the shooting. But Stephenson taped conversations, allegedly with Parker, in which Parker implicated himself in the Baker shooting. Stephenson was acquitted by a jury, and Parker was indicted for the Baker shooting.

### B. The Laknogony McCurley Murder.

In July 2000, at an intersection near Jewish Hospital in Louisville, a car carrying four African–American males pulled next to Laknogony McCurley's car. Three members of the Bloods gang, a rival gang to the Victory Park Crips, were in McCurley's car. Gunfire broke out, and McCurley's car was riddled with bullets. McCurley died; one of her passengers, Chicoby Moore, was injured; two other passengers, Kerry Williams and DeLeon "Keoni" Burks, were uninjured. Parker was eventually indicted for McCurley's murder, the

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, Todd Dryden Ferguson, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, George G. Seelig, Lebanon, KY, for Appellee.

Opinion of the Court by Chief Justice MINTON.

## I. INTRODUCTION.

After a jury trial, Kenneth Parker was sentenced to, along with lesser sentences, two terms of imprisonment for life without the possibility of parole for twenty-five years. Parker, the alleged leader of the Victory Park Crips gang in Louisville, also known as the Rat Pacc, appeals the judgment as a matter of right,[1] raising numer-

---

1. Ky. Const. § 110(2)(b).

attempted murder of Williams and Burks, assault in the second degree as to Moore, and tampering with physical evidence for allegedly disposing of the guns used in the shooting.

### C. The Tao Parker Shooting.

Tao Parker is Kenneth Parker's cousin. According to Coffey, Kenneth had an argument with Tao in March 2001 over the fact that Tao owed Kenneth money for drugs. Tao was shot; and, as a result, Kenneth was charged with assault in the first degree and attempted murder.

### D. Murder of JaJuan Stephenson.

In April 2001, a masked gunman killed JaJuan Stephenson in broad daylight. According to Dominique Coffey, he lent Parker a gun and a thousand dollars; and Parker gave the gun and the money to Clifford Warfield to kill Stephenson, who had implicated Parker in the Levolia Baker shooting. A witness, Sheldon Wright, identified Warfield as someone he saw fleeing the murder scene. Parker, along with Warfield and Coffey, was ultimately charged with Stephenson's murder.

### E. Murder of William Barnes.

In March 2002, a deal had been set up between Coffey and his acquaintance, Rommell Taylor, in which Coffey was to buy cocaine from Taylor. When the deal was to be commenced, Taylor was accompanied by William Barnes. Shots rang out as those three men (Coffey, Taylor, and Barnes), accompanied by a fourth man, walked down an alley. Coffey shot and wounded Taylor; Barnes was shot and killed. Taylor contended that Parker was the fourth man present. Parker, Warfield, and Coffey were charged with murdering and robbing Barnes, and attempting to murder Taylor.

### F. Procedural History.

In July 2002, the grand jury issued a twenty-five count indictment against Parker and others named and un-named. The charges against Parker proceeded to a jury trial. The jury convicted Parker of (1) assault in the first degree of Baker, (2) the attempted murder of Burks, (3) the attempted murder of Williams, (4) assault in the second degree of Moore, (5) tampering with physical evidence, (6) the attempted murder of Taylor, (7) robbery in the first degree, (8) conspiracy to traffic in a controlled substance, (9) criminal syndication, (10) the murder of Barnes, and (11) the murder of McCurley.

The trial court ultimately sentenced Parker in accordance with the jury's recommendations. The trial court's judgment imposed (1) ten years for assaulting Baker, (2) twenty years each for the attempted murders of Burks and Williams, (3) five years for the assault of Moore, (4) five years for tampering with physical evidence, (5) fifteen years for the attempted murder of Taylor, (6) ten years for the robbery of Barnes, (7) twenty years for conspiracy to traffic in a controlled substance, and (8) twenty years for criminal syndication. The trial court ordered all those sentences to be served concurrently, except the robbery sentence, which the trial court ordered to be served consecutively to the other offenses. In total, the effective sentence was for thirty years' imprisonment. Also, the trial court accepted the jury's recommendation and sentenced Parker to life imprisonment without the possibility of parole for twenty-five years each for the murders of Barnes and McCurley.

### III. ANALYSIS.

Parker raises a host of issues in this appeal. We shall address each separately,

although not in the order he argued them in his brief.

### A. *The Criminal Syndication Count of the Indictment Did Sufficiently State an Offense.*

Parker contends the criminal syndication count of the indictment fails to state an offense. We disagree.

The criminal syndication charge is contained in count one of the indictment. Count one reads in its entirety as follows:

> That between the 1st day of January, 1996, and the 17th day of July, 2002, in Jefferson County, Kentucky, the above named defendants, Kenneth Parker, DeShawn Parker, Wilbert Bethel, Marcus Stallard, Clifford Warfield and Dominique Coffey, and others known and unknown, committed the offense of Criminal Syndication by doing one or more of the following: (a) organizing or participating in organizing a criminal syndicate; (b) providing material aid to a criminal syndicate; (c) managing, supervising or directing any of the activities of a criminal syndicate; (d) conspiring or attempting to commit, or acting as an accomplice in the commission of a criminal syndicate; (e) conspiring or attempting to commit or act as an accomplice in the commission of[ ] any offense of violence.

According to Kentucky Revised Statutes (KRS) 506.120(1), there are seven actions a person may take to commit criminal syndication. Specifically, KRS 506.120(1) provides that:

> (1) A person, with the purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, shall not do any of the following:
>
> (a) Organize or participate in organizing a criminal syndicate or any of its activities;

> (b) Provide material aid to a criminal syndicate or any of its activities, whether such aid is in the form of money or other property, or credit;
>
> (c) Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility;
>
> (d) Knowingly furnish legal, accounting, or other managerial services to a criminal syndicate;
>
> (e) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of a type in which a criminal syndicate engages on a continuing basis;
>
> (f) Commit, or conspire or attempt to commit or act as an accomplice in the commission of, any offense of violence; or
>
> (g) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of bribery in violation of KRS Chapters 518 or 521, or KRS 119.205, 121.025, 121.055, 524.070, 156.465, 45A.340, 63.090, 6.080, 18A.145, or 244.600.

Similarly, a *criminal syndicate* is defined in KRS 506.120(3) as:

> (3) As used in this section "criminal syndicate" means five (5) or more persons collaborating to promote or engage in any of the following on a continuing basis:
>
> (a) Extortion or coercion in violation of KRS 514.080 or 521.020;
>
> (b) Engaging in, promoting, or permitting prostitution or human trafficking in violation of KRS Chapter 529;
>
> (c) Any theft offense as defined in KRS Chapter 514;
>
> (d) Any gambling offense as defined in KRS 411.090, KRS Chapter 528, or Section 226 of the Constitution;

(e) Illegal trafficking in controlled substances as prohibited by KRS Chapter 218A, in intoxicating or spirituous liquor as defined in KRS Chapters 242 or 244, or in destructive devices or booby traps as defined in KRS Chapter 237; or

(f) Lending at usurious interest, and enforcing repayment by illegal means in violation of KRS Chapter 360.

■ Parker acknowledges that our precedent holds that all that is necessary for an indictment properly to charge an offense "is to name the offense." [2] And the indictment at issue sufficiently names the offense of criminal syndication. But Parker contends that we should adopt a specificity requirement for criminal syndication charges. Toward that end, Parker contends that a criminal syndication indictment must allege at least one of the seven methods of committing the crime set forth in KRS 506.120(1) and one of the six forbidden activities set forth in KRS 506.120(3). We disagree.

■ Parker has not cited any specific authority that would move us to except criminal syndication from our general pronouncement that an indictment sufficiently charges an offense simply by naming the offense. Holding in Parker's favor on this issue would be a de facto return to the old Code of Criminal Practice, which our predecessor Court stated "requir[ed] an indictment to contain every essential element of the crime charged." [3]

■ In sum, we reiterate our commitment to the principle that an indictment properly states an offense merely by naming the offense charged. In other words, a criminal syndication indictment is not infirm and subject to dismissal solely because it lacks a detailed recitation of the underlying facts. The protocol for a defendant who desires more information is to serve a motion for a bill of particulars.[4] The indictment in the case at hand closely tracked KRS 506.120(1). Nothing else was required.

B. *Trying All of the Charges Against Parker in One Trial was Permissible.*

■ Parker contends that the trial court erred by permitting all of the charges to be tried together because trying all of the charges together constituted an improper "piling on." We disagree.

■ RCr 6.18 provides, in relevant part, that "[t]wo (2) or more offenses ... may be charged in the same indictment ... in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." Even after offenses have been joined in an indictment, a trial court may order the offenses to be tried separately if a joint trial would prejudice either the Commonwealth or the defendant.[5] Because a de-

---

**2.** *Thomas v. Commonwealth,* 931 S.W.2d 446, 449 (Ky.1996).

**3.** *Fitzgerald v. Commonwealth,* 403 S.W.2d 21, 23 (Ky.1966).

**4.** Kentucky Rules of Criminal Procedure (RCr) 6.22. *See also Fitzgerald,* 403 S.W.2d at 23 ("Furthermore, RCr 6.22 entitles the defendant in a criminal proceeding to have a bill of particulars if he entertains a doubt as

to the nature of the crime charged."). In fact, although not mentioned in the briefs, Parker did file a motion for a bill of particulars, to which the Commonwealth submitted a multi-page response.

**5.** RCr 9.16 ("If it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses or of defendants in an indictment, information, complaint or uniform citation or by joinder for trial, the court

fendant is prejudiced simply by virtue of being tried at all, we require a defendant to show that he would be "unfairly prejudiced" by a joinder.[6] Since a trial court has "broad discretion with respect to joinder[,]" we may only reverse a trial court's joinder decision upon "a showing of prejudice and clear abuse of discretion."[7]

The very nature of the offense of criminal syndication, as set forth in KRS 506.120, requires proof of underlying crimes. So severing the underlying crimes from the syndication charge would seem to defeat the entire purpose of the charge of criminal syndication and would not promote justice or efficiency. In other words, the criminal syndication charge serves to link the other charges together. Even the charges that do not specifically underlie the syndication charge helped present the jury with a more complete picture of the alleged activities of Parker and the Victory Park Crips. And aside from his speculation that a jury was more likely to convict him due to the multitude of charges, Parker has pointed to no concrete prejudice (for example, having to present completely antagonistic defenses to various charges or having to admit guilt on a lesser offense in an attempt to avoid conviction on a higher offense). So we conclude that the trial court did not clearly abuse its wide discretion by denying Parker's severance motion.

### C. *The Trial Court Did Not Err in Refusing to Grant a Mistrial.*

At trial, Sheldon Wright, who was a reluctant witness, testified that he did not recall telling the authorities he saw Warfield running from the scene of Stephenson's murder. Instead, Wright contended he had no personal knowledge of the matter and had merely repeated back to the police what he had heard being discussed in the neighborhood. In response to a question from the Commonwealth, Wright testified that he did recall telling a detective he (Wright) might be hurt if he testified in court. No objection was made to that exchange. On cross-examination, Parker's counsel asked if Wright had been hiding in fear of retribution. In a rambling answer, Wright stated, without objection, that he had wondered if he was going to be a target.

Later, the Commonwealth asked Wright on re-direct if he recalled telling a detective that he (Wright) would be killed if he showed up for court. Wright stated that he did not remember making that statement but added that he felt like he could have been in danger. The Commonwealth then asked Wright whether he felt like he could be in danger, to which Wright responded, "Right." The trial court then interjected, "Let's move on." Only then did defense counsel move for a mistrial. During the colloquy at the bench, defense counsel stated that the trial court could "certainly" admonish the jury to disregard the last question and answer. The trial court found the testimony to be improper but denied the mistrial and admonished the jury to disregard the last question and answer. Parker claims the trial court's refusal to grant a mistrial was an error. We disagree.

---

shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires.").

**6.** *Ware v. Commonwealth,* 537 S.W.2d 174, 176 (Ky.1976) ("A good deal of tripe has grown up around the question of what sort of prejudice should entitle a defendant to a separate trial. Perhaps the rule itself is not sufficiently explicit. 'Prejudiced' means unfairly prejudiced. A defendant is prejudiced, of course, by being tried at all.").

**7.** *Jackson v. Commonwealth,* 20 S.W.3d 906, 908 (Ky.2000).

A court should grant a mistrial only if it is manifestly necessary to do so.[8] Since a mistrial is an "extreme remedy[,]" it "should be resorted to only when there is a fundamental defect in the proceedings...."[9] We use the abuse of discretion standard when reviewing a trial court's decision to deny a mistrial.[10]

We agree with Parker that Wright's statement about fearing that he would be harmed for testifying against Parker was improper. Jury verdicts must be based upon admissible evidence, not jurors' fear of the allegedly vengeful nature of a defendant. And the Commonwealth does not argue in its brief that Wright's statements were proper. But we disagree with Parker's contention that a mistrial was necessary.

"A jury is presumed to follow an admonition to disregard evidence[,]" and an admonition is presumed sufficient to cure errors.[11] The only two circumstances in which an admonition is deemed an insufficient curative measure are:

(1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, or (2) when the question was asked without a factual basis *and* was inflammatory or highly prejudicial.[12]

But this case does not fall within those exceptions because the improper testimony was relatively brief in nature given the lengthy trial. And defense counsel did not object when Wright first mentioned fearing retribution and, in fact, raised that issue himself during cross-examination. Also, although not mentioned by the parties, the record reflects that at one point, Coffey testified without objection that he did not want to "turn against" Parker because he feared for his safety. In short, we believe the trial court's admonition was a sufficient curative measure, rendering a mistrial unnecessary.

### D. *Parker's Prosecutorial Misconduct Argument Fails.*

Parker raises three separate arguments under the umbrella of prosecutorial misconduct. He contends reversible error occurred (1) when the Commonwealth repeatedly referred to Parker as the leader of the Crips; (2) because the Commonwealth made repeated references to an allegedly incriminating rap CD, which was not introduced into evidence; and (3) because the Commonwealth committed discovery violations. We reject Parker's arguments that reversible error occurred.

#### 1. *Standard of Review.*

Counsel is allowed "broad latitude" in presenting a case to a jury.[13] So mere improper remarks, standing alone, are not sufficient for reversal.[14] Rather, a reviewing court must determine whether the complained-of prosecutorial miscon-

8. *See, e.g., Shabazz v. Commonwealth*, 153 S.W.3d 806, 810 (Ky.2005).

9. *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky.2004).

10. *Campbell v. Commonwealth*, 260 S.W.3d 792, 799 (Ky.2008).

11. *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003).

12. *Id.* (citation and quotation marks omitted).

13. *Dean v. Commonwealth*, 844 S.W.2d 417, 421 (Ky.1992).

14. *Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir.1979).

duct "was of such an 'egregious' nature as to deny the accused his constitutional right of due process of law." [15] Our review focuses on whether the trial as a whole was fair, not solely upon the culpability of the prosecutor.[16] Reversal is proper only if the prosecutorial misconduct "is so serious as to render the trial fundamentally unfair." [17]

### 2. References to Parker as Gang Leader Not Reversible Error.

During both opening statement and closing argument, the Commonwealth repeatedly referred to Parker as the leader of the Crips. Parker contends those references constitute prosecutorial misconduct because they lacked an evidentiary basis.

Our review of the record shows that the Commonwealth repeatedly referred to Parker as the leader of the Crips. But despite Parker's contention to the contrary, we have not been directed to a place in the record where Parker lodged a contemporaneous objection to that characterization.[18] So we deem this issue unpreserved for appellate review, meaning that we may reverse only if the misconduct was a palpable error that resulted in manifest injustice.[19]

The comments at issue were not so egregious as to have undermined the basic integrity and fairness of Parker's trial. As the Commonwealth noted in its response

to Parker's motion for a new trial, the jury could reasonably have inferred that Parker was the leader of the Victory Park Crips by virtue of the fact that he seemed to be the person who made the ultimate decisions to commit the acts in question. After all, Coffey testified, without objection, that Parker had named the gang the Rat Pacc and that he and Parker were above the other gang members in the drug-dealing hierarchy. The fact that no witness specifically identified Parker as the leader of the gang does not necessitate reversal. An attorney is permitted to make reasonable comments on the evidence and urge the jury to draw reasonable inferences from the evidence.[20] For example, it was not improper for the Commonwealth to contend in closing argument that Coffey's testimony showed that he lacked sufficient intelligence to have planned and executed the crimes allegedly committed by the Crips. In sum, having considered the comments, we do not believe they are so egregious as to have undermined the fairness and integrity of the proceedings.

### 3. References to Rap CD Not Reversible Error.

Parker contends that the Commonwealth engaged in reversible error when it repeatedly referred to a rap CD, which allegedly contains a rap in which Parker and other Crips rapped about a violent act they committed in July 2000

---

**15.** *Slaughter v. Commonwealth*, 744 S.W.2d 407, 411 (Ky.1987).

**16.** *Id.* at 411–12.

**17.** *St. Clair v. Commonwealth*, 140 S.W.3d 510, 554 (Ky.2004).

**18.** Many of the references in Parker's brief to where this issue was allegedly preserved contain no discussion of Parker's status as a gang leader. Other citations refer to post-trial motions and hearings. Obviously, an objection

after the conclusion of a trial is insufficient to preserve an issue for appellate review.

**19.** RCr 10.26. However, our conclusion would be the same if this issue had been properly preserved.

**20.** *See, e.g., Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky.2005); *Woodall v. Commonwealth*, 63 S.W.3d 104, 125 (Ky.2001) ("Clearly, the prosecutor can give his opinion of the evidence.").

(*i.e.*, the McCurley murder). Although the CD was mentioned several times, the CD apparently was never admitted into evidence.

The Commonwealth called as a witness a person who helped produce the CD. The Commonwealth also called as a witness a police officer who purchased the CD, in Parker's presence, from another member of the Crips. The Commonwealth also questioned Coffey about the CD. The direct testimony linking Parker to the CD was Coffey's assertion that Parker had acknowledged that he participated in performing the rap recorded on the CD.

This is not the first time we have confronted this same CD. In a separate trial, the Commonwealth played the CD during opening statements in the trial of Kenneth Parker's brother, DeShawn Parker.[21] But the Commonwealth was unable later to persuade the trial court to admit the CD into evidence because, like in the case at hand, the CD could not be properly authenticated.[22] We held in DeShawn Parker's case that it was error to play the CD during opening statements and to refer to it during the trial.[23] We held that the trial court erred in not granting a mistrial because:

> the Commonwealth was able to tell the jury that the CD referred to the Appellant having committed the murder of which he was accused, and that he was bragging about it through the CD recording (which was clearly prejudicial) even though the CD could not be suffi-

ciently authenticated to be admitted into evidence.... By using unauthenticated materials in opening statement the Commonwealth unfairly exposed the jury to inflammatory information of such a nature that no admonition could reasonably be believed to cure it.[24]

But the question before us in the case at hand is not the same question that was before us in DeShawn Parker's case. Kenneth is not alleging that the trial court erred by not granting his request for a mistrial. Actually, Kenneth has not argued that he even requested a mistrial. Instead, Kenneth argues that the Commonwealth engaged in prosecutorial misconduct by referring to an inadmissible item of evidence (the CD). The Commonwealth's terse response only generically argues that the trial court did not abuse its discretion.

We are somewhat at a disadvantage because none of the parties have pointed to any specific point in the record where the trial court actually denied a motion by the Commonwealth to admit the CD into evidence; and we shall not search the voluminous record in this case to try to pinpoint that event, if it occurred.[25] Regardless, the question is whether it was proper for the trial court to permit the Commonwealth to refer to a CD that, apparently, was never introduced into evidence. To ask that question is to answer it because a jury's verdict must be based on the evidence actually admitted into evidence, which the CD was not.[26] So the

21. *Parker v. Commonwealth*, 241 S.W.3d 805, 807 (Ky.2007).

22. *Id.*

23. *Id.* at 808.

24. *Id.* at 809.

25. *See, e.g., Robbins v. Robbins*, 849 S.W.2d 571, 572 (Ky.App.1993). We point out that

the vast record in this case consists of 1,691 pages of written materials and twenty-one videotapes. We do not even know with certainty whether the Commonwealth ever formally sought admission of the CD into evidence.

26. This basic premise is encompassed in, for example, former Justice Cooper's model jury instruction regarding the presumption of in-

trial court erred by permitting the Commonwealth to refer repeatedly to damning material that was not admitted into evidence. The question then becomes whether the Commonwealth's referral to the CD was so egregious as to constitute reversible prosecutorial misconduct.

The references to the CD were neither fleeting nor brief. The CD was discussed by at least three witnesses for the Commonwealth. But a crucial distinction between the case at hand and DeShawn Parker's case is that the CD was apparently never played for the jury in the case at hand. So, unlike DeShawn Parker's case, the jury in the present case was not given the impossible task of attempting to disregard the damning contents of the CD. So the error in the case at hand was not nearly as egregious as in DeShawn Parker's case. We conclude that the references to the CD in the case at hand were not so far beyond the bounds of ethical propriety as to undermine the basic fairness and integrity of the trial.

### 4. *Alleged Discovery Violations Do Not Constitute Reversible Error.*

 Although he makes passing reference to other alleged discovery violations, Parker's only substantive claim is that the Commonwealth failed to meet its obligation to provide an alleged oral statement by Levolia Baker. When Parker called Baker as a witness, Baker testified that Parker did not shoot him. That testimony apparently was consistent with Baker's testimony in the trial of JaJuan Stephenson. In rebuttal, the Commonwealth called Detective Harvey Hunt, who testified that Baker had told Hunt after Stephenson's trial that Parker had shot Baker. Parker contends the Commonwealth's

failure to provide Baker's statement to Hunt in discovery was a violation mandating reversal. We disagree.

Although not mentioned in the briefs, our review of the videotape of Baker's testimony reveals that the Commonwealth asked Baker whether he had told Hunt after Stephenson's trial that Parker was the person who shot him (Baker). Baker responded that he had not. Immediately after that exchange, a bench conference occurred in which Parker's counsel stated that he did not receive any such statement by Baker in discovery. The Commonwealth responded that there was no written statement and that it planned to call Hunt later to testify concerning his conversation with Baker. The trial court then stated simply that the issue would be addressed at the time Hunt was called in rebuttal.

Two days later, the Commonwealth called Detective Hunt in rebuttal. Before Hunt testified, Parker objected to Hunt's testimony on the grounds that it was a reopening of the Commonwealth's case-in-chief, not impeachment. Importantly, that objection contained no reference to Baker's alleged statement to Hunt not being provided to Parker during discovery. The trial court permitted the questioning because Baker had testified that he did not make a statement to Hunt that Parker had shot him (Baker). Hunt then testified that he had a conversation with Baker after Stephenson's trial, during which Baker told Hunt that he (Baker) was scared to say that Parker had shot him. Parker then called the prosecutor from Stephenson's trial, Joseph Gutmann. Gutmann testified that Baker had identified Stephenson as the shooter. Gutmann further testified that Detective Hunt never told

nocence. 1 Cooper KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 2.02 (5th ed. 2006) ("You shall find the Defendant not guilty **unless you** **are satisfied from the evidence alone** and beyond a reasonable doubt that he is guilty.") (emphasis added).

him that Baker had testified falsely out of fear of Parker.

We question whether this alleged discovery violation is properly preserved since Parker's counsel seemingly abandoned the discovery argument when Hunt testified. But even if we assume solely for the purposes of argument that the issue is preserved, Parker is not entitled to relief. Baker testified that he did not make an incriminating statement regarding Parker to Hunt. And Prosecutor Gutmann testified that he was not told by Hunt that Baker had identified Parker as the shooter. So instead of being caught unawares, Parker was able to blunt most, if not all, of the force of Hunt's testimony.

Even if we assume the Commonwealth failed to meet its discovery obligation by timely failing to turn Baker's statement over to Parker,[27] there has not been a showing of prejudice sufficient to constitute reversible prosecutorial misconduct. In other words, any discovery error by the Commonwealth regarding Baker's statement was not so egregious as to have undermined the basic fairness and integrity of the trial.[28]

### E. Trial Court Did Not Abuse its Discretion in Admitting Rommell Taylor's Identification of Parker.

Parker contends that his identification by Rommell Taylor should have been suppressed as being unduly suggestive. We disagree.

As mentioned before, Taylor had set up a drug transaction with Coffey. Others were present at the transaction, including Barnes. Barnes was shot and killed, and Taylor was wounded. At a suppression hearing, an officer testified that Coffey had told the officer, before the officer's discussion with Taylor, that Parker was present when Barnes was killed and Taylor was wounded. The officer testified that he showed Taylor a large photograph (actually, a fake "wanted" poster) containing six members of the Crips; and Taylor picked Parker from that photograph as having been present during the shootings, although he stated that the person he chose (Parker) usually wore glasses. The officer did state that Taylor had said he could not be certain Parker was the person present at the shootings. Taylor later identified Parker from a lineup. The trial court stated on the record that the fact the poster said, "Wanted, U.S. Marshal, $1,000,000," was suggestive. So the trial court continued the hearing so that Taylor could testify. When the hearing resumed about two weeks later, Taylor also testified that he had seen the fourth individual (Parker) before and had picked Parker out of a lineup. Taylor testified all four men were face-tp-face before the shootings. But Taylor also testified he was not completely sure if Parker was the man present during the shootings.

▮▮▮ When a defendant challenges an identification procedure, "the primary

---

27. In a departure from our prior precedent, we recently ruled that the Commonwealth is obligated to provide in discovery all oral incriminating statements made by a defendant of which the Commonwealth is aware. *Chestnut v. Commonwealth*, 250 S.W.3d 288, 295–96 (Ky.2008). That ruling is distinguishable from the case at hand, however, because the alleged incriminating oral statement in the case at hand was not made by the defendant himself. Also, the issue in the case at hand is brought to us only in the guise of alleged

prosecutorial misconduct, not whether the admission of Hunt's testimony was a reversible error.

28. *Cf. Weaver v. Commonwealth*, 955 S.W.2d 722, 725 (Ky.1997) (holding that a discovery violation only mandates reversal if there is a reasonable probability that the timely disclosure of the evidence in question would have changed the result of the trial).

evil to be avoided is a very substantial likelihood of irreparable misidentification." [29] We utilize a two-step process to determine if a very substantial likelihood of an irreparable misidentification has occurred. First, we determine if the circumstances leading to the identification were "unduly suggestive." [30] Only if the circumstances were unduly suggestive do we move on to the next step where we determine if the identification was, nevertheless, reliable.[31] In that second step, we consider the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.[32]

 Since Taylor's initial identification of Parker was based upon his depiction in a fake wanted poster, we accept, for the purposes of argument, the trial court's conclusion that Taylor's identification of Parker was suggestive. So we move on to consider the five factors set forth in *Neil v. Biggers*, using the abuse of discretion standard.[33]

### 1. Taylor's Opportunity to View the Criminal at the Time of the Crime.

Taylor testified that all four men involved in the drug deal were face-to-face for about five minutes and that the lighting was sufficient for him to see the others. We disagree with Parker's baseless conclusion that five minutes is an insufficient time for valid eyewitness identification. The relatively brief period of time in which Taylor viewed Parker and Taylor's testimony that he was not focused upon Parker during that time more properly fall within the next factor under *Neil*. So this factor weighs in favor of the Commonwealth.

### 2. Taylor's Degree of Attention.

Neither the Commonwealth nor the trial court analyzed this factor.[34] But, by his own admission, Taylor did not pay a great deal of attention to Parker since he (Taylor) was more focused upon Coffey. So we must conclude that this factor weighs somewhat in Parker's favor.

### 3. The Accuracy of Taylor's Prior Identification of Parker.

Taylor apparently did not give the police a prior description of the fourth man present at the drug deal. So we agree with

---

**29.** *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quotation marks omitted).

**30.** *Dillingham v. Commonwealth*, 995 S.W.2d 377, 383 (Ky.1999).

**31.** *Id.*

**32.** *Riley v. Commonwealth*, 620 S.W.2d 316, 318 (Ky.1981), citing *Neil*, 409 U.S. at 199–200, 93 S.Ct. 375.

**33.** *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky.2004). We recognize that the majority opinion in *King* was joined in full by only three members of this Court (one member of the Court concurred in result). However, we

have recently cited *King* at least twice for the principle that a trial court's ultimate decision regarding the admissibility of a witness's identification is reviewed under the abuse of discretion standard. *Burrell v. Commonwealth*, No.2006–SC–000547–MR, 2008 WL 3890049 at *7 (Ky. Aug.21, 2008); *Jones v. Commonwealth*, No.2007–SC–000147–MR, 2008 WL 4601237 at *7 (Ky. Sep.18, 2008).

**34.** The Commonwealth spends much of its brief focusing upon the fact that Parker's counsel was present during the lineup. But the presence of counsel is not among the factors that we must consider.

the trial court that this factor is irrelevant to this case.

### 4. *Taylor's Level of Certainty.*

At the suppression hearing, Taylor repeatedly testified that he was not certain Parker was the fourth man present at the drug deal. So this factor weighs in Parker's favor.

### 5. *Length of Time Between the Crime and Taylor's Identification of Parker.*

Taylor picked Parker from the fake wanted poster only two days after the shooting. And Taylor picked Parker from the lineup only a few days later. So we agree with the trial court that this factor weighs in favor of the Commonwealth.

Our analysis reveals that two factors weigh in favor of Parker and two factors weigh in favor of the Commonwealth. So the decision as to whether to admit Taylor's identification of Parker was a close call. Since reasonable minds could have differed over the admissibility of that identification, we cannot say that the trial court's decision to admit Taylor's identification was so "arbitrary, unreasonable, unfair, or unsupported by sound legal principles" [35] to constitute an abuse of discretion. So we must affirm.

### F. *Trial Court Did Not Abuse its Discretion By Admitting Prior Testimony or Taped Conversations of JaJuan Stephenson.*

As stated before, Stephenson was originally charged with shooting Baker. But Stephenson was acquitted of that charge, after which Parker was charged with shooting Baker. Parker was also charged with killing Stephenson. In an effort to prove those charges, the Commonwealth was permitted to play taped recordings for the jury of two incriminating conversations ostensibly between Stephenson and Parker. And the Commonwealth was permitted to play for the jury portions of the testimony given by Stephenson at his own trial. Parker contends the introduction of this evidence was reversible error. We disagree.

### 1. *The Taped Conversations.*

Attorney Scott Drabenstadt (who represented Coffey), testified that he recognized Parker's voice on the taped conversations. According to Drabenstadt, he had spoken with Parker in person between twelve and twenty-four times, and he had also spoken with Parker on the telephone an additional twelve to twenty-four times. Drabenstadt testified there was no doubt in his mind that the voice he heard on the tapes was Parker's. The next witness, Rocky Farmer, a former investigator for the public defender's office—through whom the tapes were admitted—testified that he was present when the two taped conversations occurred and that he had contemporaneously listened to Stephenson's side of the conversation. Farmer also testified that he listened to the taped conversations with Stephenson. But Farmer also testified he did not know for sure that Stephenson had actually called Parker because he was not familiar with Parker's voice and had no record of the phone number Stephenson called. And Farmer could not say with certainty that the person Stephenson called in the second taped conversation was the same person Stephenson had spoken to in the first taped conversation.

**35.** *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.").

In the first taped conversation, Stephenson feigned amazement at reading the medical report, which showed that Baker was shot four times, and asked the other person in the conversation how many shots he "squeeze[d] off[,]" to which the other person (ostensibly Parker), answered "I think it was four." In the other conversation, Stephenson asked the other person in the conversation (ostensibly Parker) whether when "you" shot "him" (presumably meaning when Parker shot Baker) was "he" (Baker) facing "you" (Parker) or was "his" (Baker's) back turned, to which the other person responded that the person shot was "like sideways" and didn't know what was happening.[36]

Obviously, the taped conversations are incriminating. But the question before us is whether the trial court abused its discretion by permitting the Commonwealth to play them for the jury.[37]

### a. *Authentication.*

■ We must first address Parker's contention that the Commonwealth failed adequately to authenticate the tapes.[38] Authentication of these tapes was complicated because the Commonwealth could not compel either alleged participant in the two conversations to testify since one participant was dead and the other had a constitutional right to refuse to testify. Nevertheless, the Commonwealth contends that the combined testimony of Drabenstadt and Farmer was sufficient to authenticate the tapes. We agree.

Although it surprisingly was not discussed by the parties, Parker's voice could be authenticated under Kentucky Rules of Evidence (KRE) 901(b)(5), which provides that a voice can be properly identified (*i.e.*, authenticated) if the proponent of the evidence offers the witness's "opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" regardless of whether the witness had previously heard the voice in question "firsthand or through mechanical or electronic transmission or recording . . . . "

■ Drabenstadt testified he had spoken in person and on the phone with Parker many times. So Drabenstadt clearly had heard Parker's voice "at any time under circumstances connecting it with the alleged speaker." So, under the express language of KRE 901(b)(5), Drabenstadt was qualified to express his opinion that the voice on the tapes was Parker's voice; and it was up to the jury to determine what weight to give Drabenstadt's testimony.[39] We reject Parker's

---

**36.** Our review of these conversations is hampered by the fact that some portions of the conversations are unintelligible, and others are filled with expletives.

**37.** *See, e.g., Brewer v. Commonwealth,* 206 S.W.3d 313, 320 (Ky.2006) ("An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion.").

**38.** Of course, merely finding that the tapes were properly authenticated does not necessarily end our inquiry. *Matthews v. Commonwealth,* 163 S.W.3d 11, 23 (Ky.2005) ("the establishment of authenticity of a document does not necessarily mean that the document

is admissible because there may be other barriers, *e.g.,* hearsay, to its admission.").

**39.** *Accord Brown v. City of Hialeah,* 30 F.3d 1433, 1437 (11th Cir.1994) ("Once a witness establishes familiarity with an identified voice, it is up to the jury to determine the weight to place on the witness's voice identification.").

So Parker's argument that Drabenstadt, a Caucasian, may not have been able adequately to distinguish African–American voices (such as Stephenson's and Parker's) was a factor that goes to the weight to be given Drabenstadt's identification of Parker's voice, not its admissibility.

contention that Drabenstadt was offering expert or scientific testimony that necessitated a *Daubert*[40] hearing. Instead, we conclude Drabenstadt was merely offering lay opinion testimony that the voice on the tapes was Parker's.[41]

█ We also reject Parker's argument that the Commonwealth committed reversible error by not providing Parker during discovery with notice that Drabenstadt would testify that he recognized Parker's voice on the tapes. Tellingly, Parker has not cited to any authority that would require the Commonwealth to provide in discovery notice of which witness would identify a voice on a tape recording. And Parker has not pointed to any discovery order by the trial court that would have compelled the Commonwealth to disclose Drabenstadt's planned testimony.

This case is markedly different from cases cited by Parker involving identification of a defendant via a lineup for which counsel was not present.[42] In the case at hand, Parker was not required to go anywhere or do anything to further Drabenstadt's voice identification; therefore, the constitutional concerns inherent in a post-indictment visual lineup were not present.[43] Indeed, Parker's attorney conceded that he was on notice that the Commonwealth planned on calling Drabenstadt as a witness. So Parker's counsel had the opportunity to investigate the planned parameters of Drabenstadt's testimony. Additionally, Parker did not seek a continuance in order to have additional time to prepare for his cross-examination of Drabenstadt.

Moreover, the Commonwealth played snippets of the two taped conversations for

**40.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (setting forth parameters for admissibility of scientific testimony).

**41.** *See, e.g., State v. Smith*, 307 S.C. 376, 415 S.E.2d 409, 415 (S.C.App.1992) ("For some time, a witness' testimony of identification of a person by having heard his voice has been regarded as legitimate and competent evidence to establish identity in criminal cases. We are aware of no authority in this state that requires a witness either to be an expert or have training in voice identification before so testifying.") (citation omitted); *State v. Burnison*, 247 Kan. 19, 795 P.2d 32, 40 (1990) ("A witness need not be an expert in voice identification to testify as to the identity of a defendant's voice.... The general rule is that a witness' testimony that she recognized the accused's voice is admissible, provided the witness has some basis for comparison of the accused's voice with the voice identified as the accused's.") (citation omitted).

**42.** *See, e.g., United States v. Wade*, 388 U.S. 218, 236–37, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and

assure a meaningful confrontation at trial, there can be little doubt that for Wade the postindictment lineup was a critical stage of the prosecution at which he was as much entitled to such aid (of counsel) ... as at the trial itself. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an intelligent waiver.") (footnote, citation, and quotation marks omitted).

**43.** *Cf. White v. State*, 66 Md.App. 100, 502 A.2d 1084, 1088–89) (Md.1986) ("A majority of other states and the federal courts have held that a criminal defendant has no right to have counsel present at a voice line-up procedure. The issue presented to us here is not the right to counsel at the 'live' voice line-up, but rather at the taped replay. The 'live' voice line-up situation is arguably analogous to a 'live' visual line-up. The taped replay of the voice line-up, however, is more analogous to a photo-array identification. As in photo-array cases, the defendant is not present, so confrontation is not a problem, and the procedure is capable of exact repetition, so that defense counsel can later review it.") (footnote and citation omitted).

Drabenstadt; and Drabenstadt stated he had heard those tapes before and that he had no doubt the second voice on the tape was Parker's. Additionally, Farmer testified that he was present when the two taped conversations occurred, that he had listened to the tapes with Stephenson close in time to when the conversations occurred, and that the taped conversations played for the jury were the same conversations he helped Stephenson record. Finally, we note that the second person on the tape answered to the name "Wee Wee," which was one of Parker's nicknames.[44] In sum, the Commonwealth presented sufficient evidence to authenticate the taped conversations.

### b. *Admissibility.*

Although we have concluded that the Commonwealth adequately authenticated the taped conversations, we must also address Parker's argument that the admission into evidence of those tapes violated his Sixth Amendment right to confront the witnesses against him. More specifically, Parker contends the statements on the tapes were testimonial, causing their admission to run afoul of the United States Supreme Court's decision in *Crawford v. Washington.*[45] The Commonwealth contends that admission of the taped conversations did not run afoul of the Sixth

Amendment or *Crawford* because Parker, himself, was responsible for Stephenson's being unavailable as a witness. And, therefore, the statements fall within the hearsay exception set forth at KRE 804(b)(5), which provides that the hearsay rule does not apply to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

We begin with the conclusion that the taped conversations are hearsay.[46] Even though they were not obtained as a result of any interrogation by the police, we begin by assuming, for argument's sake, that the statements on the tapes were testimonial.[47] Since Parker had no prior opportunity to cross-examine Stephenson on the matter, the statements would normally be excluded. But both *Crawford* and its progeny recognize the principle inherent in KRE 804(b)(5): a criminal defendant should not profit from ensuring that the declarant is unavailable to testify. As stated by the United States Supreme Court:

> when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants

---

**44.** At the beginning of the conversations, Stephenson asks the other person, "What's up, Wee Wee?"

**45.** 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability [of the declarant] and a prior opportunity for cross-examination.").

**46.** *See* KRE 801(c) (defining *hearsay* as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the proof of the matter asserted.").

**47.** *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford:* that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.[48]

The Commonwealth argues that since Parker killed Stephenson, thereby rendering him unavailable as a witness, Parker cannot complain that Stephenson's statements were inadmissible hearsay. Parker's response is that the Commonwealth failed to introduce sufficient proof to show that he killed Stephenson, as borne out by the jury's inability to reach a verdict on that charge.[49]

■ The United States Supreme Court recently issued *Giles v. California,*[50] which narrows the limits of the forfeiture-by-wrongdoing exception. Under *Giles,* it is no longer sufficient under KRE 804(b)(5) simply to show that a defendant caused the declarant's absence; rather, the forfeiture-by-wrongdoing exception to the confrontation clause is applicable "only when the defendant engaged in conduct *designed* to prevent the witness from testifying."[51] Or, as *Giles* has been interpreted by the Illinois Supreme Court, "[t]he doc-

trine of forfeiture by wrongdoing may not be employed to deny an accused his confrontation right absent evidence that, when committing the crime or other wrongdoing, the accused was motivated by the desire to prevent the witness from testifying against him at trial."[52] Under *Giles,* we must determine not only whether there was sufficient evidence that Parker caused Stephenson's unavailability; but we must further determine whether there was sufficient evidence to show that Parker's motivation in causing Stephenson's absence was to prevent Stephenson from testifying. Unfortunately, the *Giles* opinion does not provide clear guidance in how to approach these thorny issues.

■ Although we have not yet had occasion in a published opinion to address what impact, if any, *Crawford* and its progeny, as well as *Giles,* had on KRE 804(b)(5), we have addressed *Crawford's* relationship to KRE 804(b)(5) in the unpublished case of *Buckman v. Commonwealth.*[53] In *Buckman,* we held that *Crawford* and *Davis* were essentially in accord with KRE 804(b)(5).[54] We held the proper procedure was for the proponent of the hearsay evidence in question (a tape of an unavailable witness's statement in *Buckman*) to show "good reason to believe that the defendant has intentionally procured the absence of the witness," after

48. *Id.* at 833 (citation omitted). ·

49. But Parker was convicted of assaulting Baker, the charge to which the taped conversations were directed at proving. So this issue is not moot.

50. —— U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). *Giles* was issued after the submission of the briefs in this case and, consequently, was not discussed by Parker or the Commonwealth. Our research reveals that neither this Court nor the Kentucky Court of Appeals has cited *Giles* in any opinion, published or unpublished.

51. *Id.* at 128 S.Ct. 2683, Because *Giles* is based upon on a federal constitutional principle (i.e., the Confrontation Clause), we must follow it.

52. *In re Rolandis G.,* 232 Ill.2d 13, 327 Ill. Dec. 479, 902 N.E.2d 600, 616 (2008).

53. No.2005–SC–000148–MR, 2007 WL 858815 at *2–3 (Ky. Mar.22, 2007).

54. *Id.*

which "the burden then shifts to the opposing party to offer credible evidence to the contrary." We emphasized in *Buckman* that the proponent of the evidence need only prove by a preponderance of the evidence that the defendant engaged or acquiesced in wrongdoing that made the declarant unavailable.[55] We also held that we may only disturb a trial court's decision on this type of question if that decision is clearly erroneous.[56] We believe our decision in *Buckman,* although unpublished, was sound and contains the proper procedural framework for analyzing these types of issues.[57] Furthermore, we conclude that the procedure used in *Buckman* is consistent with *Giles.*

*Giles* left open the proper procedure for trial courts to use when facing a forfeiture-by-wrongdoing claim. A plurality of the United States Supreme Court in *Giles* opined that it was "repugnant to our constitutional system of trial by jury" for evidence such as that at issue to be introduced against "those murder defendants whom the judge considers guilty (after less than a full trial, mind you, and of course before the jury has pronounced guilt)...."[58] Yet the plurality then opined that a trial judge could "be allowed to inquire into guilt of the charged offense in order to make a preliminary evidentiary ruling ... when, for example, the defen-

dant is on trial for murdering a witness in order to prevent his testimony."[59]

Evidence must be admissible before it can be admitted. Stated differently, a trial court—as the gatekeeper of evidence—may decline to permit a party's presenting evidence, including evidence of forfeiture by wrongdoing, if the trial court finds that evidence to be inadmissible. From a purely procedural standpoint, we believe a trial court promotes justice and judicial economy by engaging any forfeiture-by-wrongdoing issues before trial begins so that the parties and the court can be fully cognizant of the evidence that likely will be presented to the jury. Otherwise, the trial judge and the parties will face a recess in mid-trial to conduct an evidentiary hearing outside the jury's presence on whether the requirements of KRE 804(b)(5) and *Giles* have been met,[60] with neither party knowing beforehand what evidence it must be prepared either to offer or rebut.

Regardless of when the trial court addresses the forfeiture-by-wrongdoing issue, we agree with the California Court of Appeals that a trial court must hold an evidentiary hearing before ruling on the admissibility of the proposed hear-

---

55. *Id.* Our usage of the preponderance of the evidence standard in *Buckman* is apparently in accord with the standard used in other courts. *Davis,* 547 U.S. at 833, 126 S.Ct. 2266 ("We take no position on the standards necessary to demonstrate such forfeiture [of the right to confrontation], but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard .... State courts tend to follow the same practice ....") (citation omitted).

56. *Buckman,* 2007 WL 858815 at *3.

57. Kentucky Rules of Civil Procedure (CR) 76.28(4)(c) permits the citation of unpublished opinions of the appellate courts of this Commonwealth rendered after January 1, 2003, if there is no published opinion that adequately addresses the issue before the court.

58. *Giles,* —— U.S. at ——, 128 S.Ct. at 2691.

59. *Id.* at 2691 n. 6.

60. *See, e.g., United States v. Taylor,* 2008 WL 4186934 (E.D.Tenn. Sept.5, 2008) (court held a *Giles*-related hearing mid-trial).

say.[61] In this evidentiary hearing, the proponent of the hearsay must first introduce evidence establishing good reason to believe that the defendant intentionally procured the absence of the declarant, then the burden of going forward shifts to the party opposing introduction of the hearsay to offer credible evidence to the contrary. And as we quoted in *Buckman* concerning the degree of deference accorded the trial court's ultimate ruling on this admissibility issue,

> '[w]hen the determination [of admissibility] depends upon the resolution of a preliminary question of fact, the resolution is determined by the trial judge under KRE 104(a) on the basis of preponderance of the evidence and the resolution will not be overturned unless clearly erroneous....' *Young v. Commonwealth*, 50 S.W.3d 148, 167 (Ky. 2001).[62]

Turning again to the case at hand, we must first determine whether the Commonwealth met its burden of establishing by a preponderance of the evidence that Parker either engaged in—or at least acquiesced in—wrongdoing designed to prevent Stephenson from testifying. We find the Commonwealth met its burden. As mentioned before, Coffey testified that he loaned Parker money and lent him a gun and that Parker gave the money and gun to Warfield to kill Stephenson. Wright also testified that he saw Warfield fleeing the area of Stephenson's murder.

We conclude that *Giles* was satisfied because, although it did not have to do so, the trial court—and later the jury—could certainly have reasonably inferred from all of the unique facts and circumstances of this case that Parker was motivated to kill Stephenson in order to prevent him from testifying that Parker shot Baker.[63] The dual motive of revenge and prevention of future testimony was the central point of the Commonwealth's theory of the case.

We next must consider whether Parker has offered credible evidence to the contrary. Parker has not pointed us to any place in the record where he offered such evidence.[64] Instead, Parker merely incorrectly contends that the Commonwealth did not offer evidence sufficient to shift the burden to him. So we conclude that the taped conversations did not violate the Confrontation Clause under *Crawford* and *Giles*, meaning that the trial court's decision to admit those taped conversa-

---

**61.** *See People v. Osorio*, 165 Cal.App.4th 603, 611, 81 Cal.Rptr.3d 167 (Cal.Ct.App.2008) ("Although the [*Giles*] court did not expressly specify any particular procedure or level of proof required for determining whether the doctrine applies, it recognized that where the defendant is on trial for the witness's murder, the trial court must conduct an evidentiary hearing before admitting the witness's statement if the defendant objects to its admission.").

**62.** *Buckman*, 2007 WL 858815 at *3.

**63.** Since the Commonwealth needed only to satisfy the preponderance of the evidence standard in order for the evidence to be admissible, the jury's inability to find Parker guilty beyond a reasonable doubt of killing Stephenson does not alter our analysis, especially in light of the fact that the jury convicted Parker of assaulting Baker.

**64.** Parker's reference to at least one juror not voting guilty on the charge of murdering Stephenson is inapposite. First, the Commonwealth's burden regarding introducing the statements under KRE 804(b)(5) was based on a preponderance of the evidence standard, not the beyond a reasonable doubt standard needed for a criminal conviction. Second, Parker was under an obligation to offer credible proof to rebut the Commonwealth's proof that tended to show that Parker had a role in Stephenson's unavailability. Merely pointing to a jury's verdict, or inability to reach a verdict, is not sufficient to meet that burden.

tions was neither clearly erroneous nor an abuse of discretion.

### 2. *Stephenson's Prior Testimony.*

The propriety of admitting Stephenson's prior testimony, in which he implicates Parker in the shooting of Baker, involves many of the same concerns. But Parker does not offer any argument regarding the authentication of the tapes.[65] Rather, Parker only objects to the introduction of the prior testimony on *Crawford* grounds.

Again, we accept Parker's contentions that Stephenson's prior testimony was both testimonial and hearsay. But we conclude that the testimony did not violate the Confrontation Clause under *Crawford* and *Giles.* Again, the Commonwealth presented evidence from Coffey and Wright that tended to show by a preponderance of the evidence that Parker was responsible for (or at least acquiesced in) Stephenson's inability to be present to testify and that Parker's intent was to kill Stephenson so that Stephenson would be unavailable to testify in Parker's trial. The burden then shifted to Parker to show credible evidence to the contrary. Parker has, again, not satisfied that burden because he has not pointed us to any specific credible evidence. So we conclude the trial court's decision to permit the playing of Stephenson's prior testimony was neither clearly erroneous nor an abuse of discretion.

### G. *No Reversible Error Stemming from Shameka Wright's Testimony.*

In August 2000, Shameka Wright[66] told the police she had informa-

tion about the gang war between the Crips and the Bloods. Shameka also told the police that on the night McCurley was murdered, she (Shameka) was at a skating rink where McCurley, Burks, Williams, and Moore were present. Shameka said she called Parker to buy marijuana; and Parker asked, using a racial slur, if Burks and Williams were present with her.[67] When Shameka tried to deny their presence, Parker said he already knew they were there; and "it" (presumably meaning the gang feud) would end that night. Shameka told Burks her fear that he (Burks) would be killed by Parker. Burks, Williams, McCurley, and Moore left the skating rink; and Shameka did not see the shootings in which McCurley was killed and Moore was injured.

According to Shameka, she called Burks's grandmother later that night out of concern for Burks's welfare. Burks's grandmother told Shameka that Burks and Williams were okay, but McCurley was dead. Shameka then called Parker, who asked whether Burks and Williams had been shot. Shameka told Parker no, that he had killed an "innocent" person. Parker uttered an expletive and hung up.

In response to Parker's contention that Shameka should only be able to testify as to the events surrounding the McCurley murder, the trial court cautioned Shameka in the presence of the jury that she could testify only as to conversations she had with Parker, not about what someone else had told her. Shameka proved to be an extremely difficult witness for the Com-

---

**65.** The tapes were authenticated and then played for the jury via the testimony of a bench clerk who kept court records and was employed by the Jefferson Circuit Clerk.

**66.** We will refer to Shameka Wright simply as Shameka to, hopefully, avoid confusion with the aforementioned Sheldon Wright.

**67.** At trial, Shameka admitted calling Parker's cell phone number but testified that she was not sure if the person she spoke to was actually Parker.

monwealth, displaying a belligerent attitude and repeatedly stating that she could not remember the contents of her statements to the police. In fact, Parker's counsel stated at the bench that he had no objections to the Commonwealth asking Shameka leading questions or using a transcript of her statements to try to refresh her recollection. The trial court then instructed the Commonwealth to "[d]o whatever you need to do."

The Commonwealth then placed a copy of the transcript of Shameka's August 3, 2000,[68] statement to the police at the witness stand and repeatedly referred to it during questioning. Soon the Commonwealth's questioning largely consisted of reading from transcripts of Shameka's statement to the police and asking Shameka if the Commonwealth's recitation was consistent with the transcripts. At many points, Shameka admitted the Commonwealth's statements were consistent with the transcripts but denied the transcripts' accuracy, at one point even referring to a transcript as "crap." Over the defense's objection, the Commonwealth also played for the jury an approximately thirty-minute audio tape of one of Shameka's statements to the police. Much of that taped statement contained statements by Shameka regarding the violent history of the feud between the Crips and the Bloods (including Williams and Burks). But, on the tape, Shameka repeatedly referred to what she had heard; and Shameka testified at trial that she had no personal knowledge of the feud's history.

On appeal, Parker contends that much of Shameka's testimony was hearsay because she only had first-hand knowledge of what occurred at the skating rink. So

Parker objects on hearsay grounds to the trial court's permitting the Commonwealth to play to the jury the entirety of Shameka's taped statement.

As stated before, hearsay is inadmissible.[69] And the Commonwealth in its brief does not refute Parker's contention that many of the statements on the taped statement are hearsay. The Commonwealth contends that Shameka's testimony was admissible because it "only documented the running feud that existed between the Bloods and the Crips and did not implicate the appellant's [Parker's] involvement in any way." As Parker points out in his reply brief, however, the Commonwealth's argument is actually an acknowledgement that the challenged portions of Shameka's taped statement are irrelevant. And irrelevant evidence is inadmissible.[70] So the fact that much of Shameka's taped statement did not directly implicate Parker is an additional reason to exclude the evidence, not a reason to admit it.

The Commonwealth also argues that Shameka's taped statement was admissible to show that Shameka "was coherent and cooperative during her August 9 statement ...." But we agree with Parker that whether Shameka was cooperative during her interactions with the police had no direct bearing on Parker's guilt. At most, evidence of Shameka's cooperative attitude could have been used to impeach her claim that the transcripts did not accurately reflect the entirety of her interactions with the police. There was no pressing need for the Commonwealth to play the entire taped conversation in order to convey Shameka's attitude to the jury.

We recognize that Shameka's recalcitrance and defiant attitude made the situa-

**68.** The McCurley murder occurred during the early morning hours of July 31, 2000.

**69.** KRE 802.

**70.** *See* KRE 402 ("Evidence which is not relevant is not admissible.").

tion difficult and frustrating for the Commonwealth, the trial court, and Parker. But the mere fact that a witness is openly hostile is not a license for the admission of hearsay. We conclude that the trial court abused its discretion by permitting the Commonwealth to play to the jury the hearsay portions of Shameka's taped statement.[71] The question before us is whether the admission of Shameka's hearsay was a harmless error.[72] We conclude it was harmless.

Having determined the trial court erred by permitting the Commonwealth to play the entire taped statement to the jury we, nevertheless, conclude that the error was harmless. The inadmissible statements did not appear to implicate Parker. So Parker's argument to the contrary notwithstanding, the introduction of the inadmissible statements, which comprised only a small fraction of this lengthy trial, was a harmless error.

### H. *Parker Was Not Entitled to a Directed Verdict.*

Parker contends he was entitled to a directed verdict on the conspiracy to traffic in a controlled substance charge and the criminal syndication charge. We disagree with Parker's contention as to the conspiracy to traffic in a controlled substance charge, but we agree that he should

have been granted a directed verdict on the criminal syndication charge.

#### 1. *Standard of Review.*

The familiar standard for ruling on a motion for directed verdict is:

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[73]

#### 2. *Conspiracy to Traffic in a Controlled Substance Charge.*

The jury was instructed that to find Parker guilty of conspiracy to traffic in a controlled substance, it must find beyond a reasonable doubt three main ele-

**71.** *Brewer,* 206 S.W.3d at 320 ("An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion.").

**72.** RCr 9.24 ("No error in … the admission … of evidence … is ground for granting a new trial or for setting aside a verdict … unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.").

We have sometimes expressed different harmless error standards, variously holding that an error is harmless if "there is not a substantial possibility that the result would have been any different," *McIntire v. Commonwealth,* 192 S.W.3d 690, 698 (Ky.2006), or that an error is harmless "if there is no reasonable possibility that it contributed to the conviction." *Anderson v. Commonwealth,* 231 S.W.3d 117, 122 (Ky.2007). Regardless of which precise standard is used, the error in this case is harmless.

**73.** *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

ments: (1) Parker entered into an agreement with Warfield and Coffey to traffic in cocaine; and (2) in furtherance of that agreement Parker stole cocaine from Barnes with intent to distribute, transfer, or sell the cocaine; and (3) one or more of the conspirators was armed with a firearm during the conspiracy. Parker argues that he was entitled to a directed verdict because Coffey testified that he did not agree to sell drugs with Warfield and Parker.

Coffey did testify that he did not have an agreement with either Parker or Warfield to sell drugs, memorably declaring to Parker's attorney, "We never agreed to nothing, sir." But Coffey's testimony was inconsistent because he also stated that he "had arranged a drug deal" with Taylor. Coffey also testified that Barnes had showed him a block of cocaine Barnes had hidden in his coat. Coffey also testified that he was armed with a gun given to him by Parker and that Parker also was armed during the drug deal. In addition, Coffey

testified that it was Parker's idea to rob Barnes and Taylor. Finally, Coffey testified that he unsuccessfully tried to obtain his share of the cocaine from Parker after the killing of Barnes.

Based on Coffey's testimony, the Commonwealth introduced sufficient evidence to show that at least one of the conspirators was armed. The question becomes whether the Commonwealth presented enough proof that there was an agreement to traffic in cocaine and that the cocaine was stolen with the intent to distribute, transfer, or sell it.

■ We conclude that the large amount of cocaine Coffey testified to having seen hidden in Barnes' coat [74] permitted—but did not require—the jury to infer that Parker, Coffey, and Warfield intended to steal the cocaine from Barnes in order to distribute, sell, or otherwise transfer it.[75] Likewise, Coffey's testimony that he

---

**74.** Coffey testified that the cocaine shown him by Barnes looked like a "block" and that the deal was for the purchase of three kilograms of cocaine. Taylor testified that he had agreed to sell Coffey three kilograms of cocaine and that he had shown Coffey a kilogram of cocaine earlier on the day Barnes was killed. So it is reasonable to infer, drawing all reasonable inferences in favor of the Commonwealth, that Barnes possessed a large amount of cocaine at the time he was killed. Since no cocaine was recovered, it may be inferred that the cocaine was stolen.

**75.** *See, e.g., State v. McCleod,* 186 S.W.3d 439, 447 (Mo.Ct.App.2006) (holding that although possession of seven and one-half ounces of marijuana was insufficient to infer an intent to deliver the marijuana, "[c]ertainly, at some point, the amount of a controlled substance in a defendant's possession can establish, beyond a reasonable doubt, that the defendant intended to deliver or distribute that substance to others."); *United States v. Payne,* 805 F.2d 1062, 1066 (D.C.Cir.1986) ("evidence of a significant quantity of drugs is highly suggestive of intent to distribute....");

*Commonwealth v. Rugaber,* 369 Mass. 765, 343 N.E.2d 865, 868 (1976) ("Intent to distribute a drug may be inferred from possession of large quantities of that drug."); 28A C.J.S. *Drugs and Narcotics* § 384 (2008) ("An intent to distribute, deliver, or sell controlled substances may be inferred from the possession of a large quantity of a controlled substance. A reasonable *inference* of intent to deliver a controlled substance is permitted when the amount possessed cannot be viewed as intended for personal consumption. Thus, a jury is permitted, but not required, to infer intent to distribute when a person possesses an amount of a controlled substance that is too large to be used by the possessor alone.") (footnotes omitted).

Better practice, of course, would have been for the Commonwealth to have presented evidence from a qualified witness that the *amount of cocaine Parker and his cohorts* intended to steal from Barnes was inconsistent with personal use. But the fact that the Commonwealth has not pointed us to anywhere in the record where it presented such proof is not fatal because common sense dictates that three kilograms of cocaine is suffi-

tried unsuccessfully to get his share of the cocaine from Parker later that night would permit the inference that Parker stole the cocaine from Barnes, even though Parker allegedly told Coffey that he (Parker) had not taken the cocaine. So drawing all reasonable inferences in favor of the Commonwealth, it was not unreasonable for the jury to have found Parker guilty beyond a reasonable doubt of conspiracy to traffic in a controlled substance.

### 3. *Criminal Syndication Charge.*

■ Although KRS 506.120 contains many methods for committing criminal syndication, according to the essential parts of the instruction the trial court issued to the jury, the jury could convict Parker only if it found beyond a reasonable doubt that Parker "committed, conspired or attempted to commit or act as an accomplice in the commission of any offense of violence" and that when he did so, Parker had the "intent to establish, maintain, or facilitate any of the activities of an organization consisting of five or more persons collaborating to promote or engage in Trafficking in a Controlled Substance on a continuing basis." [76] Parker contends the Commonwealth failed to show that he collaborated with others to traffic in a controlled substance. This argument is without merit since we have previously explained that the Commonwealth did present enough proof to withstand Parker's motion for a directed verdict on the conspiracy to traffic in a controlled substance charge.

cient to raise an inference that the cocaine was not meant for personal use. *Cantrell v. Kentucky Unemployment Insurance Commission,* 450 S.W.2d 235, 237 (Ky.1970) ("When all else is said and done, common sense must not be a stranger in the house of the law.").

**76.** Parker has not argued the trial court's instruction was erroneous.

■ But the offense of criminal syndication requires the collaboration of five or more persons. [77] By contrast, the trafficking charge at hand only involved three persons—Parker, Coffey, and Warfield. "The collaboration in the statute means simply collaborating in the scheme, and it is not necessary for the Commonwealth to show that each participant collaborating in the scheme collaborated with or even was aware of the collaboration of the other participants." [78] And criminal syndication requires the illegal conduct (in this case, trafficking in a controlled substance) to occur on a "continuing basis[,]" [79] as opposed to the singular drug deal that resulted in Barnes' death. In order to prove the activity occurred on a continuing basis, "[t]he Commonwealth is not held to proving any specific number of incidents or any element of time, but must show by the proof what the jury could infer from the evidence as intent to collaborate on a continuing basis." [80]

We must determine whether the Commonwealth adduced proof that at least two others joined Parker, Coffey, and Warfield in collaborating to promote or engage in trafficking in a controlled substance and that the collaboration occurred on a continuing basis.

■ Our efforts are greatly hampered by the unfortunate dearth of information in the Commonwealth's brief. After quoting KRS 506.120, the Commonwealth's brief merely generically provides that:

**77.** KRS 506.120(3).

**78.** *Commonwealth v. Phillips,* 655 S.W.2d 6, 9 (Ky.1983).

**79.** KRS 506.120(3).

**80.** *Phillips,* 655 S.W.2d at 9.

While the gang consisted of nine to twelve active members, the appellant would act individually or with small groups in activities related to the furtherance of the Crips [sic] authority-retaliating against the Bloods, securing drug turf, securing drug for re-sale, and maintaining the integrity of the business by shooting people who were behind in their payments (even if the victim is a relative). It was not clearly unreasonable to submit the charge of criminal syndication to the jury because appellant's actions and the actions of other members of the Crips were designed to facilitate the syndicate's activities as required by the statute.

Noticeably lacking from the Commonwealth's brief is a single citation to precedent or other authority or to the record to support its contention that the trial court did not err in denying Parker's motion for a directed verdict. Indeed, the Commonwealth does not name the four or more additional persons who allegedly assisted Parker in the Crips's drug trafficking efforts, nor does the Commonwealth point to anything specific in the record to show that Parker and the Crips collaboratively trafficked in drugs on a continuing basis.[81] It is well-settled that an appellate court will not sift through a voluminous record to try to ascertain facts when a party has failed to comply with its obligation under Kentucky Rules of Civil Procedure (CR) 76.12(4)(d)(iv)[82] (in the case of an Appellee's brief) to provide specific references to the record.[83] So we will not undertake in the task of reviewing the approximately twenty videotapes that Parker's trial record consumes to determine if the Commonwealth introduced sufficient evidence to withstand Parker's motion for a directed verdict on the criminal syndication charge.

In reviewing the record for the other arguments raised in this appeal, we viewed Coffey testifying in such a manner as to leave no doubt that there were at least five members of the Crips. But we have not been directed to any testimony that would show that at least five Crips collaborated on a continuing basis to traffic in drugs. In fact, Coffey testified to the contrary when he stated that the Crips made their own deals and sold their own drugs. Although Coffey testified that all of the Crips sold drugs to earn money, Coffey also memorably testified that "every man did their own thing." And the only drug-related offense was the conspiracy to traffic in narcotics charge, for which only three individuals were named as conspirators. Additionally, that charge involved only a one-time drug deal or robbery, not a continuing collaboration to sell narcotics.

---

**81.** The Commonwealth's passing reference in this section of its brief to another section dealing with the propriety of joining all charges for trial is similarly unhelpful because the other section does not provide the necessary information.

**82.** RCr 12.02 expressly provides that CR 76 is applicable to criminal cases.

**83.** *See, e.g., Sharp v. Sharp,* 491 S.W.2d 639, 644 (Ky.1973) ("We will not search the thirteen volumes of testimony to find the evidence, therefore this contention is rejected."); *Robbins,* 849 S.W.2d at 572 (Ky.App.1993) ("Video tape recordings require significantly more time to review than written transcripts and, given the fact that our courts have consistently refused to search written records in cases in which the briefs have failed to make reference to the record, we likewise decline to do so here."); *Wagers v. Commonwealth,* 475 S.W.2d 635, 635–36 (Ky.1972) ("Counsel fails either to relate the testimony of which complaint is made or refer us to where that testimony may be found. We will not consider this contention.").

Although much of the precedent on this issue involves an Appellant's failure to refer to the record with specificity, CR 76.12(4)(d)(iv) imposes the same requirement of referring to the record with specificity upon an Appellee.

It is simply beyond question that one incident involving only three individuals is not sufficient to prove the existence of an ongoing collaboration involving at least five individuals.

In short, the Commonwealth has not pointed to any evidence to show that it presented proof that Parker and at least four other persons collaborated to traffic in narcotics on a continuing basis. So we must conclude the trial court erred by failing to grant Parker's motion for a directed verdict on the criminal syndication charge.[84] Parker's criminal syndication conviction is reversed for that reason.

### I. *McCurley Murder Properly Subject to an Aggravated Penalty.*

■ McCurley was murdered in 2000, and Barnes was murdered in 2002. Parker contends he should not have been subjected to an aggravated penalty for the McCurley murder based upon his having caused multiple deaths.[85] We disagree.

Parker's argument runs contrary to our settled precedent. In *Simmons v. Commonwealth*, we held that it was permissible to use multiple deaths as an aggravator even though the defendant caused the three deaths one at a time and on different dates.[86] The defendant in Simmons argued that the multiple death aggravator found in KRS 532.025 could be used only if a defendant caused more than one death simultaneously. We disagreed, concluding that "[w]ith respect to the vicious propensities of a defendant which are indicative of his danger to society, it is certainly no less compelling that on three different occasions he had committed a murder than if he had killed three people at one time." [87] So we construed the statute's reference to "the act or acts of killing which result in multiple deaths to mean the deaths of more than one person, whether simultaneously or not." [88] More simply, we later held that "[o]nce the jury determined that two of [Appellant's] acts of killing were intentional and resulted in multiple deaths, the multiple murder aggravating factor applied." [89] The jury in this case found, in writing, that Parker's acts of killing McCurley and Barnes were intentional and resulted in multiple deaths.

■ We reject Parker's contention that our holding in *Simmons* should not apply to this case because there were other statutory aggravators present in *Simmons*. The jury need find only one statutory ag-

---

84. The fact that the Commonwealth did not ultimately adduce proof sufficient to convict Parker of criminal syndication does not alter our conclusion that the trial court did not err by trying the criminal syndication charge with the other charges. After all, it is impossible to know with precision at the beginning of trial, the time when such joinder decisions necessarily must be made, what evidence will be presented during the trial. Likewise, the fact that the Commonwealth did not prove Parker's guilt regarding the criminal syndication charge beyond a reasonable doubt does not render infirm the indictment on that charge.

85. KRS 532.025(2)(a)(6) provides that a jury or trial court may consider as an aggravating

factor that "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths...."

86. 746 S.W.2d 393, 398–99 (Ky.1988).

87. *Id.* at 399.

88. *Id.*

89. *Bowling v. Commonwealth*, 873 S.W.2d 175, 181 (Ky.1993). We recognize that the murders in *Bowling* apparently occurred close in time. However, that fact does not negate the applicability to this case of our simple exposition in *Bowling* of when the multiple murder aggravator may apply.

gravator for a defendant to be subjected to an aggravated penalty;[90] and the fact that other aggravators were present in *Simmons* does not detract at all from our conclusion that the multiple death aggravator properly applies when a defendant causes multiple deaths, regardless of whether those multiple deaths occur on the same day or over a longer course of time.

Likewise, we reject Parker's argument that *Simmons* should not apply to him because the murders in *Simmons* were so identical as to be so-called signature crimes. But the murders of Barnes and McCurley lack such commonality. Although it is true that the murders in *Simmons* had many common characteristics, our decision on when the multiple murder aggravator may apply was based upon the number of murders, not their commonality.

Finally, we reject Parker's contention that our holding in *Simmons* was erroneous and should be overturned or modified. To the contrary, we believe *Simmons* remains an accurate interpretation of KRS 532.025.

### J. *No Cumulative Error Sufficient for Reversal.*

We disagree with Parker's contention that the cumulative effect of otherwise harmless errors necessitates reversal of his convictions. To the contrary, our examination of the record reveals that Parker's trial was fundamentally fair. Nothing more is required.[91]

### K. *No Error in Denying Request for Additional Pages in Parker's Brief.*

Parker unsuccessfully filed a motion asking us to allow him to file a brief in excess of the fifty-page limit set by CR 76.12(4)(b)(ii). Parker's counsel contends that our refusal to expand the fifty-page limit caused her to abandon issues.

We are cognizant that this is a complex case, as demonstrated by the length of this opinion. But we are convinced that use of concise language and careful editing enabled Parker's able counsel in the space of fifty pages to present adequately all potentially meritorious issues. So we conclude that Parker is not entitled to relief.[92]

## IV. *CONCLUSION.*

For the foregoing reasons, Kenneth Parker's conviction for criminal syndication is reversed and remanded to the Jefferson Circuit Court for proceedings consistent with this opinion. All of Parker's other convictions and sentences are affirmed.

All sitting. ABRAMSON, CUNNINGHAM, NOBLE, SCHRODER, and SCOTT, JJ., concur. VENTERS, J., concurs in result only by separate opinion.

VENTERS, Justice, concurring in result only:

I concur with the majority on all points but one. The majority holds that an indictment is sufficiently specific if it simply "names the offense." I disagree and respectfully submit that RCr 6.10(2), which

**90.** *Id.* ("Only one aggravating factor need be shown beyond a reasonable doubt to sustain a death sentence.").

**91.** *Bowling v. Commonwealth,* 942 S.W.2d 293, 308 (Ky.1997) ("In addition to the foregoing, the appellant asserts that cumulative errors mandate reversal of his conviction. Our review of the entire case reveals that the appellant received a fundamentally fair trial, and that there is no cumulative effect or error that would mandate reversal.").

**92.** *Cf. Bowling v. Commonwealth,* 981 S.W.2d 545, 553 (Ky.1998) ("contrary to Appellant's argument, a page limit is simply not a due process violation.").

was promulgated by this Court, requires that the indictment contain a statement of "the essential facts constituting the offense," which is something more than simply naming the offense. I concur in result because the indictment in this case complies with RCr 6.10(2).